UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JOHN TUOSTO as proposed
Administrator of the Estate of
RITA TUOSTO and JOHN TUOSTO,
Individually,

                         Plaintiff,

        - against -

PHILIP MORRIS USA INC.,

                    Defendant.

**OPINION AND ORDER**

05 Civ. 9384 (PKL)

**APPEARANCES**

LAW OFFICES OF JOSEPH M. LICHTENSTEIN, P.C.
170 Old Country Road
Suite 301
Mineola, New York 11501
Joseph M. Lichtenstein, Esq.

Attorneys for Plaintiff

HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166
Scott E. Hershman, Esq.
Stephen R. Blacklocks, Esq.

Attorneys for Defendant Philip Morris USA Inc.

**LEISURE, District Judge**:

Plaintiff John Tuosto brings this suit individually as well as in his role as administrator of Rita Tuosto's estate (collectively "Tusoto").  Rita Tuosto was drawn to smoking cigarettes in her teen years, and smoked Philip Morris cigarettes until her death from lung cancer on October 5, 2003. Defendant Philip Morris Incorporated ("PM USA") is a Virginia corporation with its principal place of business in the State of New York.  PM USA manufactures and distributes cigarettes including  "Philip Morris" and "Marlboro."

Tuosto here alleges six causes of action, all related to his claim that Rita Tuosto's cancer and death were caused by her smoking Philip Morris cigarettes:  (1) Fraud and Misrepresentation; (2) Concerted Action to Commit Fraud and Intentional Misrepresentation; (3) Strict Liability, Defective Design, Failure to Warn, and Failure to Test; (4) Negligence; (5) Loss of Consortium; and (6) Wrongful Death. (Am. Compl. ¶¶ 125-69.)

PM USA now moves for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1]  Each of PM USA's arguments will be discussed in turn.

For the reasons set forth herein, Tuosto's fraud and

---

[1] The Court notes that Tuosto has chosen to submit an Affirmation in Opposition, rather than a memorandum of law, in response to PM USA's motion for judgment on the pleadings.

1

negligent misrepresentation claims are dismissed with leave to replead, as are his strict products liability improper design and negligent design claims, and his concerted action claim. Tuosto's strict products liability failure to warn and negligent failure to warn claims are dismissed with prejudice. Tuosto's derivative claims of loss of consortium and wrongful death are dismissed with leave to replead.

### BACKGROUND

Accepting the truth of Tuosto's factual allegations at the pleading stage, as the Court must, see Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989) (citing to Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 (2d Cir. 1985)), the following recitation of the factual background of this case is drawn substantially from Tuosto's complaint[2] and does not constitute findings of fact by the Court.

I.    The Parties

Plaintiff Rita Tuosto was born in 1956 and remained a New York State resident for her entire life. (Am. Compl. ¶ 9.) She was drawn to smoking in her teen years, and was unable to quit despite her efforts to do so. (Am. Compl. ¶ 9.) Rita Tuosto always smoked PM USA's cigarettes. (Am. Compl. ¶ 9.) In 2003, Rita Tuosto was diagnosed with lung cancer, she died on October

---

[2] Tuosto filed his complaint on September 27, 2005. On that same day he filed an amended complaint ("Complaint"). All references to the Complaint hereinafter are to the amended complaint.

5, 2003, at the age of 46 or 47 years old. (Am. Compl. ¶ 10.)
Plaintiff John Tuosto was Rita Tuosto's husband from October 26,
1980 until her death on October 5, 2003. (Am. Compl. ¶¶ 11-12.)

PM USA is a Virginia corporation with its principal place
of business in the State of New York, and which regularly does
and solicits business in the State of New York. (Am. Comp. ¶
13.)

II.  Advertising, Public Statements, and the Tobacco Industry

PM USA has advertised its cigarettes to maintain brand
loyalty using images such as the "Marlboro Man." (Am. Compl. ¶¶
19-25.)  In the 1930s and 1940s PM USA sponsored cigarette
advertisements in the New England Journal of Medicine, Journal
of the American Medical Association, and in The Lancet. (Am.
Compl. ¶ 26.)  In 1952, Dr. Richard Droll, a British researcher,
released a study that publicized the hazards of cigarette
smoking. (Am. Compl. ¶ 37.)  In 1953, Dr. Ernst Wynder of the
Sloan-Kettering Institute published another study regarding the
cancer-causing properties of cigarettes. (Am. Compl. ¶ 38.)

On December 15, 1953, after the release of these studies,
termed the "Big Scare" by tobacco companies, the presidents of
the leading tobacco companies and a public relations agency by
the name of Hill and Knowlton met at the Plaza Hotel in New York
City. (Am. Compl. ¶ 39.)  At this meeting, and through
subsequent communications, the presidents of the tobacco

3

companies and Hill and Knowlton discussed the appropriate public relations path following the release of the studies that exposed the negative health effects of smoking cigarettes. (Am. Compl. ¶¶ 39-41.)  As a result of this meeting, the Tobacco Industry Research Committee ("TIRC") was established on December 15, 1953, with some overlap between TIRC and Hill and Knowlton staff. (Am. Compl. ¶¶ 42-45.)

On January 4, 1954, PM USA and others released "A Frank Statement to Cigarette Smokers," a full-page newspaper advertisement that appeared in 448 newspapers across the United States, and that announced the formation and purpose of TIRC. (Am. Compl. ¶ 49.)  The advertisement stated that TIRC would be established as a way for the cigarette companies to assist the research of the relationship between tobacco use and health. (Am. Compl. ¶ 50.)

In 1958, the tobacco companies formed the Tobacco Institute ("TI") as a trade association. (Am. Compl. ¶ 47.)  In 1962, two independent researchers stated that quitting smoking could reduce the chances of cancer in ex-smokers; however, PM USA did not inform the public of these findings. (Am. Compl. ¶ 121.)

In 1964, TIRC changed its name to the Council for Tobacco Research-USA ("CTR"). (Am. Compl. ¶ 46.)  In the same year the Surgeon General released his first report linking cigarette smoking to lung cancer. (Am. Compl. ¶ 46.)

4

In 1970, TI ran an advertisement entitled "A Statement About Tobacco and Health." (Am. Compl. ¶ 53.)  This advertisement stated that TI assisted scientists in researching tobacco, health, and certain diseases that had been linked to tobacco use. (Am. Compl. ¶ 53.)  TI released additional advertisements in 1970. (Am. Compl. ¶ 54.)  One such unidentified advertisement stated that the tobacco industry supported research into the link between tobacco and health. (Am. Compl. ¶ 54.)

In 1972, TI's President testified before Congress regarding the health research undertaken by the cigarette industry. (Am. Compl. ¶ 57.)  In March 1993, CTR's scientific director testified before Congress regarding the effects of smoking on health. (Am. Compl. ¶ 58.)  In 1994, chief executives of the tobacco companies testified before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce regarding tobacco's effect on health and specifically that tobacco was not a proven cause of disease and death and that nicotine was not addictive. (Am. Compl. ¶¶ 59, 95-97.)

Internal industry documents created between 1956 and 1981 revealed that industry insiders were aware of possible links between cancer and cigarette smoking and that CTR and other tobacco trade associations were not impartial. (Am. Compl. ¶¶ 64-73.)  In 1993, a former 24-year employee of CTR publicly

5

revealed that CTR was a lobby for cigarettes. (Am. Compl. ¶ 71.)

While PM USA and others in the tobacco industry were once concerned with developing cigarettes with reduced health risks, the tobacco companies never marketed this type of product. (Am. Compl. ¶¶ 75-85.)  In 1964, a research and development presentation to PM USA's Board of Directors revealed that a "[p]hysiologically . . . outstanding cigarette" known as "Saratoga" had been developed but that "[t]he product as test marketed didn't have good 'taste' and consequently was unacceptable to the public ignorant of its physiological superiority." (Am. Compl. ¶ 84.)

III. <u>Nicotine</u>

Nicotine, which is found in cigarettes, has been recognized as addictive and as having adverse health consequences by medical organizations such as the Office of the U.S. Surgeon General, the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Society of Addiction Medicine, and the Medical Research Council in the United Kingdom. (Am. Compl. ¶¶ 86-90.)  The nicotine level in American tobacco plants has increased between 10% and 50% between 1955 and 1980. (Am. Compl. ¶ 99.)  The nicotine content in cigarettes can be manipulated by altering the design and manufacture of the cigarettes. (Am. Compl. ¶¶ 100-08.)  PM USA has known of

nicotine's addictive properties since at least 1960, as evidenced by internal reports prepared in 1972, 1978, 1980, 1983, and 1984. (Am. Compl. ¶¶ 90-95.)  In 1984 PM USA researchers who had done research confirming the addictive properties of nicotine were told to halt their research and were forced to sign confidentiality agreements. (Am. Compl. ¶ 95.) PM USA describes the role of nicotine as "satisfaction," "impact," "strength," "rich aroma," and "pleasure." (Am. Compl. ¶ 98.)

Light, low-tar, or low-nicotine cigarettes have higher concentrations of nicotine, by weight, than their high-yield counterparts and were designed in order to achieve this effect. (Am. Compl. ¶¶ 110-17.)  On April 1994, PM USA ran an advertisement that appeared in newspapers across the country and affirmatively represented that PM USA did not manipulate nicotine levels in its cigarettes and did not believe that cigarette smoking was addictive. (Am. Compl. ¶ 119.)

## DISCUSSION

I.   Standard of Review

On a Rule 12(c) motion for judgment on the pleadings, "we apply the same standard as that applicable to a motion under Rule 12(b)(6)." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  Thus, the Court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in

favor of the non-movant;" furthermore, a court "should not dismiss the complaint 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "'A motion to dismiss is addressed solely on the fact of the pleadings.'" Ferrone v. Brown & Williamson Tobacco Corp., 1998 WL 846783 *1 (E.D.N.Y. 1998) (quoting Tinlee Enters. Inc., v. Aetna Cas. & Sur. Co., 834 F. Supp. 605, 607 (E.D.N.Y. 1993)). A court should not weigh the evidence that may be presented at trial but should only determine whether or not the complaint is legally sufficient.

Nevertheless, "'bald assertions and conclusions of law are not adequate [to state a claim] and a complaint consisting only of naked assertions, and setting forth no facts upon which a court could find a violation of the [law]'" will fail to state a claim under Rule 12(b)(6) and, therefore, also under Rule 12(c). In re Tamoxifen Citrate Antitrust Litig., 429 F.3d 370, 384-85 (2d Cir. 2005) (quoting Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)). Accordingly, in order to survive a motion for judgment on the pleadings, Tuosto must do more than simply refer to a claim and sweepingly state that the elements of that claim are satisfied. See Martin v. N.Y. State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978) (dismissing Civil Rights Acts

8

claims as wholly conclusory.)  The Court now turns to each of

the Tuosto claims.  However, the Court only considers Tuosto's

references to events, advertisements, and statements made by PM

USA subsequent to 1969, when Rita Tuosto reached "her teen

years."[3] (Am. Compl. ¶ 9.)

II.  <u>Fraud and Misrepresentation</u>[4]

Tuosto first brings a fraud claim against PM USA.  To prove

common-law fraud under New York law, "a plaintiff must show (1)

that there was a material, false representation, (2) made with

knowledge of its falsity, and (3) an intent to defraud (4) that

plaintiff reasonably relies upon, (5) causing the plaintiff

damage." <u>Kregos v. Associated Press</u>, 3 F.3d 656, 665 (2d Cir.

1993) (citing <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 974

F.2d 270, 274 (2d Cir. 1992).[5]  Furthermore, Rule 9(b) of the

Federal Rules of Civil Procedure provides in relevant part: "In

[3] In his Complaint, Tuosto alleges that Rita Tuosto "was drawn to smoking [PM
USA's] cigarettes in her teen years." (Am. Compl. ¶ 9.)  Since Rita Tuosto
did not reach her teen years until 1969 at the earliest, the Court reads
Tuosto's allegations as referring to advertisements and statements made by PM
USA in and after 1969.

[4] Courts refer to this cause of action by a number of different names,
including "fraud," <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d
Cir. 1993) (McLaughlin, J.), and "fraudulent misrepresentation," <u>Ferrone</u>,
1998 WL 846783 *4.  Regardless of which term or phrase is used, the same
legal standards apply. <u>Compare</u> <u>Mills</u>, 12. F.3d at 1175 <u>with</u> <u>Ferrone</u>, 1998 WL
846783 at *4.  The Court will hereinafter refer to it as a fraud claim.

[5] The parties do not dispute that New York state law applies to the fraud and
misrepresentation claims.  The Court will apply New York state's substantive
law on this motion, as a court is not required to conduct a choice of law
analysis <i>sua sponte</i>, and instead may apply the state law assumed by the
parties in their papers. <u>See</u> <u>Lehman v. Dow Jones & Co.</u>, 783 F.2d 285, 294 (2d
Cir. 1986) (Friendly, J.) (declining to determine whether there was a
difference between the substantive law of New York and California, and
instead applying New York law, where the parties solely cited New York case
law); <u>Deep S. Pepsi-Cola Bottling Co., Inc. v. Pepsico, Inc.</u>, No. 88 Civ.
6243, 1989 WL 48400, at *12 n.3 (S.D.N.Y. May 2, 1989) (Leisure, J.).

all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b).

Tuosto brings his fraud claim on the basis of three types of allegedly fraudulent conduct. First, Tuosto alleges that PM USA "[made] fraudulent, misleading and deceptive statements and [engaged in] practices relating to the issue of smoking and health" subsequent to 1969 that negated, in the understanding of Rita Tuosto, the causal connections between smoking and health as well as between nicotine and addiction. (Am. Compl. ¶ 126(a).) Secondly, Tuosto alleges that PM USA, and the cigarette industry in general, made "false promises to conduct and disclose objective research on the issue of smoking and health." (Am. Compl. ¶ 126(b).) Lastly, Tuosto alleges that PM USA fraudulently concealed and failed to disclose material facts regarding the issue of smoking and health. (Am. Compl. ¶ 126(c).)

Tuosto alleges that PM USA's fraudulent conduct involved two types of allegedly false representations made by PM USA: (1) statements made in the course of petitioning Congress, and (2) advertisements to consumers and the public.

PM USA disputes Tuosto's claim of fraud, arguing (1) that the Noerr-Pennington doctrine bars PM USA's civil liability for statements made in petitioning Congress, (2) that Tuosto's fraud

claim is pre-empted by the Cigarette Labeling and Advertising
Act, and (3) that Tuosto's fraud claim fails to meet the
pleading demands of Federal Rule of Procedure 9(b) as well as
the reasonable reliance element of a New York state fraud claim.
The Court addresses Tuosto's claim and PM USA's various
arguments in opposition in turn.

      A.   Noerr-Pennington Doctrine

      The Court first addresses Tuosto's allegations that PM USA
executives made false and misleading statements to Congress.
(Am. Compl. ¶¶ 57-61; 87; 95-97; 118.)  PM USA contends that,
even assuming that Tuosto's allegations are true, he refers to
conduct that is immune from civil liability under the Noerr-
Pennington doctrine.

      The Noerr-Pennington doctrine acknowledges that the right
to petition the government is a freedom that is protected by the
Bill of Rights. See Eastern R.R. Presidents Conference v. Noerr
Motor Freight, Inc., 365 U.S. 127, 138 (1961).  Under the Noerr-
Pennington doctrine, civil actions are barred where the activity
challenged under federal statute or state law consists of
"petitioning legislatures, administrative bodies, and the
courts," even if the defendant's actions had an "anticompetitive
or otherwise injurious purpose or effect." Hamilton v. Accu-Tek,
935 F. Supp. 1307, 1316-17 (E.D.N.Y. 1996); see United Mine
Worker of Am. v. Pennington, 381 U.S. 657 (1965). Noerr-

Pennington has also been applied to bar liability in state
common law tort claims, including negligence and products
liability claims, for statements made in the course of
petitioning the government. See Hamilton, 935 F. Supp. at 1317.

There are two exceptions to the protective reach of the
Noerr-Pennington doctrine:  the "mere sham" exception and the
"unethical" exception. See id.  Statements made in the course of
petitioning Congress are considered a "mere sham" when the actor
making the statements does not have a true interest in the
outcome of the effort to influence government because the effort
"is a mere sham to cover what is actually nothing more than an
attempt to interfere directly with the business relationships of
a competitor." Noerr, 365 U.S. at 144; see, e.g., Oregon Natural
Res. Covacil v. Mohla, 944 F.2d 531, 535 (9th Cir. 1991).  The
"unethical" exception denies Noerr-Pennington protection to
statements made while petitioning the government "where the
political activity involved illegal, corrupt or unethical
means." Hamilton, 935 F. Supp. at 1317.

Notwithstanding the "unethical" and "mere sham" exceptions,
Noerr-Pennington protection has been extended to all advocacy
intended to influence government action, including to allegedly
false statements. See e.g., Noerr, 365 U.S. at 140-42; Mark
Aero, Inc., v. Trans World Airlines, Inc., 580 F.2d 288, 297
(8th Cir. 1978); Mohla, 944 F.2d at 535; New York Jets LLC v.

12

Cablevision Sys. Corp., 2005 WL 2649330, *7 (S.D.N.Y. Oct 17, 2005) ("The alleged misrepresentations fall squarely within the confines of Noerr-Pennington"); Wheeling-Pittsburgh Steel Corp. v. Allied Tube & Conduit Corp., 573 F. Supp. 833, 842 (N.D. Ill. 1983). Even statements that may "fall[] far short of the ethical standards generally approved in this country" are protected by the Noerr-Pennington doctrine if they are made in the course of petitioning the government. Noerr, 365 U.S. at 140. The allegedly false and fraudulent statements made by PM USA in the course of petitioning Congress do not fall under the "mere sham" or "unethical" exceptions. Accordingly, they are shielded by the Noerr-Pennington doctrine.

PM USA's statements in petitioning Congress constitute the type of petitioning that is protected by the Noerr-Pennington doctrine and thus cannot form the basis of Tuosto's claim of fraud against PM USA.

B.    Federal Cigarette Labeling and Advertising Act Pre-emption

The Court next turns to Tuosto's allegations related to PM USA's advertisements and statements to consumers. PM USA argues that any allegedly false statements made by PM USA to consumers in advertising cannot support Tuosto's claim of fraud because such a claim is pre-empted by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-40 ("CLAA").

13

The program established through the CLAA[6] requires uniformity of labeling on cigarette packaging and "preempts all State regulation of tobacco advertising." Ferrone, 1998 WL 846783, *2 (E.D.N.Y. 1998). The CLAA was passed in 1965 following the 1964 Report of the Surgeon General's Advisory Committee that conclusively revealed that smoking posed health risks. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 542 (2001). The aims of the 1965 CLAA were twofold: "'to inform the public adequately about the hazards of cigarette smoking, and to protect the national economy from interference due to diverse, nonuniform, and confusing'" labeling with respect to smoking and health. Id. at 542-43 (quoting 15 U.S.C. § 1331). The CLAA was amended in 1969 in order to strengthen the warnings required on the cigarette packages and in order to regulate cigarette

---

[6] The CLAA reads, in pertinent part:

> It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby--
> (1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and
> (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

14

advertising more closely.[7] See id. at 544-45.   The CLAA was
amended again in 1984 to strengthen the required warnings
further and "to require four more explicit warnings, used on a
rotating basis." Cipollone v. Liggett Group, Inc., 505 U.S. 504,
508 n. 1 (1992) (citing Comprehensive Smoking Education Act,
Pub.L. 98-474, 98 Stat. 2201).   The pre-emptive scope of the
CLAA is not limited to the regulation of cigarette packaging
through positive enactments but "easily encompass[es]
obligations that take the form of common-law rules . . . 'The
obligation . . . can be, indeed is designed to be, a potent
method of governing conduct and controlling policy.'" Id. at 521
(quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236,
247 (1959)).  Accordingly, positive enactments and common-law
rules that constitute regulations of advertising or promotion
based on smoking and health are pre-empted by the CLAA, and
claims arising under such enactments or common-law rules are
also pre-empted by the CLAA. Id.

Since Tuosto's fraud claim refers specifically to allegedly
fraudulent and illegal conduct by PM USA subsequent to 1969, by
which time CLAA pre-emption was in effect, CLAA pre-emption of
the fraud claim could result in the claim's failure.[8]

_____

[7] Public Health Cigarette Smoking Act of 1969, Pub.L. 91-222, 84 Stat. 87, as
amended, 15 U.S.C. §§ 1331-40.
[8] As the Court has already noted, supra n.3, Tuosto's references in his
Complaint to events, advertisements, and statements made by PM USA prior to

15

Nevertheless, the pre-emptive scope of the CLAA does not pre-empt all common law claims. See id. at 523.  The Court therefore addresses the applicability of the CLAA to each of Tuosto's three allegations of fraudulent conduct, evaluating whether "the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading." Id. at 523-24 (quoting 9 U.S.C. § 1331).

Tuosto's first allegation of fraudulent conduct contends that, subsequent to 1969, PM USA released fraudulent statements and engaged in fraudulent practices and affirmative acts of concealment that negated, in the understanding of Rita Tuosto, the causal connections between smoking and health as well as between nicotine and addiction. (Am. Compl. ¶ 126.)  Because this allegation is predicated on Tuosto's belief that PM USA had a duty to advertise and label cigarettes in a specific manner, and is presented as a duty based on "smoking and health," it is pre-empted by the CLAA. See id. at 528; Izzarelli v. R.J. Reynolds Tobacco Co., 117 F. Supp. 2d 167, 175 (D. Conn. 2000) (stating that an allegation can survive pre-emption if it does not, among other things, "allege a fraudulent misrepresentation

---

1969 (Am. Compl. ¶¶ 24-27; 29; 32; 37-39; 42; 45; 47-49; 50-51; 62; 64; 91), are not relevant to plaintiff's claims.

claim that [defendant's] advertising neutralized or minimized the health hazards of smoking.")

On the other hand Tuosto's second allegation of fraudulent conduct contends that PM USA, and the cigarette industry in general, fraudulently represented that they would conduct and disclose objective research regarding smoking and health. (Am. Compl. ¶ 126(b).)  The claim regarding this conduct is predicated on a "duty not to deceive," rather than on a duty "based on smoking and health," and, as such, is not pre-empted by the CLAA. See Cipollone, 505 U.S. at 528-29.

Finally, Tuosto's third allegation of fraudulent conduct is that PM USA failed to disclose material facts regarding the issue of smoking and health. (Am. Compl. ¶ 126(c).)  Tuosto does not allege that PM USA should have provided ancillary or more specific warnings, nor does Tuosto claim that PM USA should have disclosed these facts through advertising or promotion. Consequently, Tuosto's claim related to this conduct is based in part on a state law duty not to deceive and "to disclose facts through channels other than advertising and promotion." Izzarelli, 117 F. Supp. 2d at 175; see Cipollone, 505 U.S. at 528-29 ("Such claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation the duty not to deceive") (quoting 9 U.S.C. § 1331).  It is thus not pre-empted by the CLAA.

17

The CLAA does not exist to "insulate cigarette
manufacturers from longstanding rules governing fraud.
Cipollone, 505 U.S. at 529.  Thus, only one of Tuosto's
allegations of PM USA's fradulent conduct, his allegation that
PM USA "[made] fraudulent, misleading and deceptive statements
and [engaged in] practices relating to the issue of smoking and
health" (Am. Compl. ¶ 126(a)), is pre-empted by the CLAA.  PM
USA's motion to dismiss the fraud claim based on CLAA pre-
emption is accordingly granted in part and denied in part.

C.    The Fraud Claim and Federal Rule of Civil Procedure
      9(b)

Even where Tuosto's allegations of fraud based on
statements PM USA allegedly made to consumers are not pre-empted
by the CLAA, PM USA argues that they should still be dismissed
as they do not meet the requirements of fraud under New York law
and under Rule 9(b) of the Federal Rules of Civil Procedure.

The essential elements of a fraud claim under New York law
include "(1) representation of material fact, (2) falsity, (3)
scienter, (4) reliance and (5) injury." Small v. Lorillard
Tobacco Co., 94 N.Y.2d 43, 57 (N.Y. 1999).  A plaintiff must
show the existence of "'a material, false representation, and
intent to defraud thereby, and reasonable reliance on the
representation, causing damage to the plaintiff.'" Turtur v.
Rothschild Registry Int'l Inc., 26 F.3d 304, 310 (2d Cir. 1994)

18

(quoting <u>Katara v. D.E. Jones Commodities, Inc.</u>, 835 F.2d 966,

970-71 (2d Cir. 1987)) (emphasis added).  Moreover, the Court

applies Rule 9(b) of the Federal Rules of Civil Procedure to its

analysis of the New York state law fraud claim.

The Court first addresses PM USA's argument that Tuosto

does not adequately plead fraud with the specificity required by

Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that a

cause of action for fraud be stated with specificity.  Thus, to

meet the requirements of Rule 9(b) a complaint must "(1) specify

the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements

were made, and (4) explain why the statements were fraudulent."

<u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir.

1993) (McLaughlin, J.).  A plaintiff must also show that

defendant acted with fraudulent intent, showing that the

defendant "had an intent to defraud, knowledge of the falsity,

or a reckless disregard for the truth." <u>Connecticut Nat'l. Bank</u>

<u>v. Fluor Corp.</u>, 808 F.2d 957, 962 (2d Cir. 1987).  These

heightened pleading standards facilitate three goals:  "(1) to

provide a defendant with fair notice of the plaintiff's claim,

(2) to protect a defendant from harm to his or her reputation or

goodwill, and (3) to reduce the number of strike suits."

<u>Ferrone</u>, 1998 WL 846783 *3 (quoting <u>Cosmas</u>, 886 F.2d at 11).

Because Rule 9(b) demands a clearly defined level of

19

specificity, it will not be "satisfied when the complaint vaguely attributes alleged fraudulent statements" to the defendant. Mills, 12 F.3d at 1175.  However, the Court recognizes that Rule 9(b) must be read in harmony with the principles established by Federal Rule of Civil Procedure 8(a). See Felton v. Walston & Co., 508 F.2d 577, 581 (2d Cir. 1974) ("[I]n applying Rule 9(b) we must not lose sight of the fact that it must be reconciled with Rule 8[,] which requires a short and concise statement of claims.")

Tuosto's fraud claim lacks the specificity required by Rule 9(b) and thus fails to prove a set of facts that sufficiently allege fraud.  Tuosto fails to enumerate PM USA's allegedly fraudulent statements and activities.  He states that:  (1) "[Rita Tuosto] was drawn to smoking Defendant's cigarettes in her teen years due to Defendant's massive advertising directed toward teenagers, and their total failure to warn as to the lethal and addictive quality of their product" (Am. Compl. ¶ 9.); and (2) "This market share has allowed the defendant to engage in a decades-long conspiracy relating to smoking, health and addiction and to direct their considerable profits to further that conspiracy" (Am. Compl. ¶ 19). These allegations of fraudulent conduct do not, however, give PM USA notice of which particular statements Tuosto contends were fraudulent.

Tuosto does refer to the 1970 TI advertisement captioned "A

20

Statement About Tobacco and Health." (Am. Compl. ¶ 53.)  While

this is a reference to a specific print advertisement released

by the TI, and the Complaint re-prints four allegedly fraudulent

statements from that advertisement, the Complaint does not

attribute this particular advertisement to PM USA directly.

Moreover, in the Affirmation in Opposition to this motion,

Tuosto simply re-states the conclusory allegations that PM USA

made fraudulent and misleading statements.[9]  Neither do the

allegations in the Complaint or the Affirmation in Opposition

specifically identify who made the statements, where and when

the statements were made, nor how exactly the statements were

fraudulent.  Furthermore, in his Complaint, Tuosto makes very

broad allegations regarding PM USA's fraudulent statements and

does not show the required intent to defraud on the part of PM

USA.  In sum, Tuosto has failed to plead fraud with the

specificity demanded by Rule 9(b).

Additionally, Tuosto's Complaint fails to plead adequately

the elements of a New York state fraud claim.  Specifically,

---

[9] In the Affirmation in Opposition, Tuosto also attempts to justify the
"borrowing" verbatim of a complaint from a separate case involving PM USA as
the defendant. (Aff. in Opp. ¶ 7.)  The Court views this as a tactical
decision on the part of Tuosto to effectuate the goal of stating a cause of
action with respect to this particular set of facts and this particular
individual given the heightened level of specificity required of these
pleadings by Rule 9(b).  However, in considering this motion, the Court is
limited to the allegations in the complaint regarding the specific parties
involved in this case, and cannot make inferences from what is stated in the
complaint about other factual scenarios in order to fortify conclusory
statements within these pleadings. See Cantor Fitzgerald Inc., v. Lutnick,
313 F.3d 704, 709 (2d Cir. 2002).

21

Tuosto's complaint fails to allege adequately reasonable reliance on a material, false representation and hence fails to state a claim for fraud and misrepresentation under New York law.  In his Complaint, Tuosto refers to an advertisement that PM USA ran in newspapers across the country in April 1994, allegedly representing that Philip Morris does not "manipulate" nicotine levels in cigarettes, and that "Philip Morris does not believe that cigarette smoking is addictive." (Am. Compl. ¶ 119.)  However, this allegation does not prove reliance by Rita Tuosto.  Tuosto's Complaint does not allege that Rita Tuosto saw this advertisement or any specific PM USA advertisement, simply that PM USA's advertisements were widely circulated and intended to mislead and, as a result, Tuosto fails to aver reliance in his Complaint. See Kregos, 3 F.3d at 665.

Tuosto's fraud claim is therefore dismissed, as none of the allegedly fraudulent conduct he presents sets forth facts upon which this Court can find a violation of the law. See In re Tamoxifen Litig., 429 F.3d at 384-85 (quoting Gregory, 243 F.3d at 692).  However, since "leave to amend should be freely given especially where dismissal of the complaint [is] based on Rule 9(b)," Alcito v. Imcera Group, Inc., 47 F.3d 47, 54-55 (2d Cir. 1995), Tuosto is hereby granted leave to replead as to those claims of fraud not precluded by Noerr-Pennington or the CLAA.

22

III. Concerted Action[10]

Under New York law, "the theory of concerted action 'provides for joint and several liability on the part of all defendants having an understanding, express or tacit,'" to act together to commit a tortious act. Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295 (N.Y. 1992) (quoting Hymowitz v. Lilly & Co., 73 N.Y.2d 487, 506).  Thus, it is essential that, in making a concerted action claim, a plaintiff shows that defendants "joined in an agreement or common scheme to commit a tortious act." Standish-Parkin v. Lorillard Tobacco Co., 12 A.D.3d 301, 303 (N.Y. App. Div. 2004).  Showing that defendants joined in agreement requires more than "a supply relationship[,] [i]t requires jointly undertaken tortious conduct." In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 841 (2d Cir. 1992) (citing Bradley v. Firestone Tire & Rubber Co., 590 F. Supp. 1177, 1180 (D.S.D. 1984); Restatement (Second) of Torts § 876 cmt. b (1979)).  Accordingly, "[p]arallel activity among companies developing and marketing the same product, without more, . . . 'is insufficient to establish the agreement element necessary to maintain a concerted action claim.'" Rastelli, 79 N.Y.2d at 295 (quoting Hymowitz, 73 N.Y.2d at 506).

---

[10] Courts refer to this cause of action by a number of different names, including "concerted action," Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295 (N.Y. 1992), and "in-concert action," In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 841 (2d Cir. 1992).  Regardless of which term or phrase is used, the same legal standards apply. Compare Rastelli, 79 N.Y.2d at 295, with In re Brooklyn Litig., 971 F.2d at 841.

23

Tuosto has failed to sufficiently plead the elements required of a claim for concerted action.  A careful reading of the Complaint shows that Tuosto does not allege facts that demonstrate the existence of either an express or tacit agreement among specific tobacco manufacturers to commit a tortious act.  Tuosto does repeatedly refer to "other cigarette makers," "industry groups," "others," "tobacco companies," and "industry executives." (Am. Compl. ¶¶ 29; 32; 37; 39-59; 61-62; 68-73; 75-76; 87-88; 97; 99-100; 104; 107; 110-112; 115-117; 131; 134; 136.)  However, these references do not specifically identify the actors who allegedly participated in the concerted action with PM USA.  Also, even where the Complaint specifically identifies other parties such as Hill & Knowlton, TIRC, CTR, TI, Liggett, R.J. Reynolds, Kimberly-Clarke Corp., LTR Industries, and Contraf Group (Am. Compl. ¶¶ 39; 41-48; 51; 53-59; 68-73; 77-81; 85; 104; 106-108), Tuosto does not assert that PM USA entered into any "agreement—express or tacit" to commit fraud or intentional misrepresentation with any of them. In re Brooklyn Litig., 971 F.2d at 841; see Ferrone, 1998 WL 846783 at *5.

In his Affirmation in Opposition to PM USA's motion, Tuosto cites Simon v. Philip Morris, 86 F. Supp. 2d 95 (E.D.N.Y. 2000), to demonstrate that pleadings similar to his own have been found sufficient to state a claim for concerted action. (Aff. in Opp. ¶ 13.)  However, the pleadings in Simon are easily

24

distinguishable from the pleadings at hand.  The <u>Simon</u> decision
cites numerous documents referenced by plaintiffs in that case
that showed a clear relationship between the defendants and
identified the defendants' tortious activity. <u>Simon</u>, 86 F. Supp.
2d at 100-24.  Tuosto provides the Court with a sketch of the
history of CTR, TIRC, and TI; makes some references to non-
specific internal industry documents; and alleges in a
conclusory manner that unidentified actors in the tobacco
industry were part of a conspiracy aimed against the general
public.  Tuosto's Complaint lacks however, the necessary
specificity that exists in the <u>Simon</u> complaint. As noted above,
Tuosto fails to specifically allege jointly undertaken tortious
conduct by specific tobacco industry companies or groups outside
of a supply relationship or parallel activity.  Accordingly, PM
USA's motion is granted and Tuosto's concerted action claim is
dismissed with leave to replead.

IV.  <u>Strict Products Liability</u>

        "'A cause of action in strict products liability lies where
a manufacturer places on the market a product which has <u>a defect</u>
that causes injury.'" <u>Kosmynka v. Polaris Indus. Inc.</u>, 462 F.3d
74, 86 (2d Cir. 2006) (Jacobs, J.) (quoting <u>Robinson v. Reed-</u>
<u>Prentice Div. of Package Mach. Co.</u>, 49 N.Y.2d 471 (N.Y. 1980)).
In strict products liability, a manufacturer may be held liable
"regardless of his lack of actual knowledge of the condition of

the product because he is in the superior position to discover

any design defects and alter the design before making the

product available to the public." Voss v. Black & Decker Mfg.

Co., 59 N.Y.2d 102, 107 (N.Y. 1983).

According to New York law, there are three types of strict

products liability claims: (1) mistake, (2) improper design,

and (3) failure to warn. See id. at 106-07.  In his complaint,

Tuosto alleges two types of strict products liability:  improper

design and failure to warn.[11] (Am. Compl. ¶¶ 142-53.)  The Court

addresses these claims in turn.

   A.   Failure to Warn

To state a claim for failure to warn, a plaintiff must show

"that 'a warning is necessary to make a product ... reasonably

safe, suitable and fit for its intended use,' that respondents

failed to provide such a warning," and that such failure was the

proximate cause of plaintiff's injury. Cipollone, 505 U.S. at

525 (internal quotation omitted).  Tuosto offers two allegations

in support of his failure to warn claim.  First, Tuosto alleges

that Rita Tuosto "could not and did not by the exercise of

---

[11] Tuosto also alleges "failure to test" as a strict products liability claim.
(Am. Compl. ¶ 146.)  "Failure to test" is not a cause of action under New
York's strict products liability law.  It is possible that Tuosto intended to
bring this as a fraud claim.  If this is the case, the Court has already
addressed this above and found that Tuosto fails to state a claim for fraud.
It is also possible that Tuosto intended to bring this as part of an improper
design claim.  Because it reads Tuosto's Complaint liberally on a motion for
judgment on the pleadings, Sheppard, 18 F.3d at 150, the Court will include
Tuosto's claim that PM USA failed to adequately test as part of Tuosto's
improper design claim.  Thus, the Court does not address "failure to test" as
a unique part of the strict products liability cause of action.

reasonable care have . . . perceived the danger of these cigarettes." (Am. Compl. ¶ 148.)  Next, Tuosto alleges that PM USA is strictly liable for failing "to provide appropriate or adequate warnings regarding the deadly nature of its product or its addictive quality." (Am. Compl. ¶ 149.)  In sum, Tuosto's failure to warn claim against PM USA alleges that PM USA should have included more specific details regarding the effect of smoking on health both in PM USA's promotional activities and in the labeling of their cigarette packaging, and that PM USA's failure to adequately warn was the proximate cause of Rita Tuosto's injuries.  PM USA argues that Tuosto's failure to warn claim is pre-empted by the CLAA.

As discussed previously, the CLAA created a Federal program "to deal with cigarette labeling and advertising with respect to any relationship between smoking and health." 15 U.S.C. § 1331. The CLAA requires uniformity of labeling on cigarette packaging and preempts State regulation of tobacco advertising. See Cipollone, 505 U.S. 511 (1992); see also Ferrone, 1998 WL 846783 at *2.  The 1969 and 1984 amendments to the CLAA required more detailed warnings on cigarette packages regarding the dangers of smoking ("Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health"), banned certain forms of cigarette advertising, and adopted an express preemption provision with regard to statements made by cigarette

27

manufacturers through advertising and promotional channels
relating to "smoking and health." See Cipollone, 505 U.S. at
515.  As a result, allegations that statements relating to
smoking and health in cigarette advertisements, warnings, or
other promotions should have been more specific or should have
contained additional warnings are pre-empted by the CLAA. See
id. at 515, 524.

Tuosto's failure to warn claim alleges that PM USA's post-
1969 advertising, labeling, or promotional activities relating
to smoking and health should have been more specific, or should
have contained clearer or additional warnings.  Tuosto's claim
is therefore squarely pre-empted by the CLAA.  PM USA's motion
is granted and Tuosto's strict products liability failure to
warn claim is dismissed without leave to replead.

B.   Improper Design

In an improper design case under New York law, a plaintiff
is required to prove that the product was not reasonably safe
for its intended use, that there existed a feasible alternative
design that would have prevented the accident, and that a design
defect was the proximate cause of plaintiff's injury. See
Rypkema v. Time Mfg. Co., 263 F. Supp. 2d 687, 692-93 (S.D.N.Y.
2003) (Sweet, J.); Voss, 59 N.Y.2d at 109.

Tuosto's Complaint alleges that PM USA's cigarettes were
defective and not reasonably safe because PM USA failed to

28

properly test its cigarettes and because PM USA did not pursue

available alternative designs. (Am. Compl. ¶¶ 143-47.)   However,

Tuosto does not allege that the particular cigarettes that Rita

Tuosto smoked contained "a legally cognizable defect." Forni v.

Ferguson, 232 A.D.2d 176, 176 (N.Y. App. Div. 1996).   "As a

matter of law, a product's defect is related to its condition,

not its intrinsic function." Id.   The Court acknowledges that

certain products may cause injury or death in the regular course

of their use, "but the mere fact of injury does not entitle the

[person injured] to recover ... there must be something wrong

with the product." DeRosa v. Remington Arms Co., 509 F. Supp.

762, 769 (E.D.N.Y. 1981).   Furthermore, allowing the allegation

that cigarettes in general are defective to constitute a claim

for improper design would contradict congressional policy

deeming the sale of cigarettes legal. See FDA v. Brown &

Williamson Tobacco Corp., 529 U.S. 120, 137-39 (2000) ("Congress

has foreclosed the removal of tobacco products from the

market."); see also Insolia v. Philip Morris Inc., 128 F. Supp.

2d. 1220, 1223 (W.D. Wis. 2000) (holding that allowing a design

defect claim against cigarettes as a category "would run afowl

of the congressional policy that the sale of cigarettes is

legal.").   Tuosto's Complaint does not identify any specific

design defect that was unique to the cigarettes that Rita Tuosto

smoked.   Tuosto's conclusory allegation that PM USA's cigarettes

29

were generally defective fails to establish the defective design element of his improper design claim.

Furthermore, even if Tuosto could show that the cigarettes were defective, he fails to present sufficient evidence of the existence of a feasible alternative design.  Two options are available to a plaintiff seeking to satisfy the burden of proving a feasible alternative design:  (1) plaintiff may introduce an expert who can show, "through testing and construction of a prototype," that an alternative design would be practical, "thereby demonstrating the utility, cost, safety, sanitation and other characteristics of the proposed alternative;" or (2) plaintiff may introduce an expert who can demonstrate that makers of a similar product have already put the proposed alternative design into use.  Rypkema, 263 F. Supp. 2d at 692.  In order to advance the existence of a feasible alternative in an improper design case, "an expert is required to ascertain feasibility, to test alternative designs, and to address the engineering factors and tradeoffs that go into the design of a product for distribution in the marketplace." Id. at 693.  Tuosto does contend that there were feasible alternative designs to PM USA's cigarettes but he does not introduce an expert to demonstrate that there actually was a feasible alternative to the cigarettes that Rita Tuosto smoked.

Tuosto cites Tomasino v. American Tobacco Co., 23 A.D.3d

30

546, 547 (N.Y. App. Div. 2005), as an ostensibly analogous case
wherein the plaintiff had stated a claim for design defect.  In
Tomasino, the plaintiff alleged that the defendant cigarette
manufacturers distributed a defectively designed product and
were consequently liable for the injuries suffered by decedent.
Id.  However, the complaint in Tomasino is distinguishable from
Tuosto's Complaint.  The court in Tomasino found that "[t]he
evidence submitted by the plaintiff . . . particularly the
affidavit of William A. Farone . . . sufficed to raise an issue
of fact as to whether the foreseeable risk of harm posed by
cigarettes could have been reduced or avoided by the adoption of
a reasonable alternative design by the manufacturer appellants."
Id. at 549.  While Tuosto an affidavit by William A. Farone
("Farone affidavit") to his Affirmation in Opposition to PM
USA's motion in order to support his improper design claim, the
Court does not find that the affidavit serves the same useful
function in this case as it did either in Tomasino or in
Inzerilla v. American Tobacco Co., Case No. 11754/96 (N.Y. Sup.
Ct.), the case from which the Farone affidavit was photocopied.

   The Farone affidavit meets neither the requirements for a
sworn statement nor the requirements for an un-sworn statement
under 28 U.S.C.A. § 1746.[12]  An affidavit "headed with the

───────────────────────

[12] 28 U.S.C.A. § 1746 states, in pertinent part:

31

caption of a different case, with a different plaintiff and a

different docket number . . . cannot be considered evidence."

Burley-Sullivan v. City of Philadelphia, 2001 WL 1175127, *4

(E.D.Pa. 2001).  Furthermore, the Farone affidavit, sworn to on

June 6, 2000, cannot be used to establish the elements of an

improper design claim because the five-year limitation period

for perjury under 18 U.S.C. § 3282 expired almost one year

before Tuosto's Affirmation in Opposition was filed on March 6,

2006. See U.S. v. Coiro, 785 F. Supp. 326, 333 (E.D.N.Y. 1992).

Thus, Tuosto cannot rely on the Farone affidavit in order to

establish the required elements of his improper design claim.

Tuosto does not present any of his own experts to demonstrate

---

Wherever, under any law of the United States or under
any rule, regulation, order, or requirement made
pursuant to law, any matter is required or permitted
to be supported, evidenced, established, or proved by
the sworn declaration, verification, certificate,
statement, oath, or affidavit, in writing of the
person making the same (other than a deposition, or
an oath of office, or an oath required to be taken
before a specified official other than a notary
public), such matter may, with like force and effect,
be supported, evidenced, established, or proved by
the unsworn declaration, certificate, verification,
or statement, in writing of such person which is
subscribed by him, as true under penalty of perjury,
and dated, in substantially the following form:
(1) If executed without the United States: "I declare
(or certify, verify, or state) under penalty of
perjury under the laws of the United States of
America that the foregoing is true and correct.
Signature, Date
(2) If executed within the United States, its
territories, possessions, or commonwealths: "I
declare (or certify, verify, or state) under penalty
of perjury that the foregoing is true and correct.
Signature, Date
(emphasis added)

that there was a feasible alternative design to the PM USA cigarettes that Rita Tuosto smoked. Thus, because he fails as a matter of law to prove two of the essential elements of an improper design claim – that there was a defect and that a feasible alternative design was available - Tuosto's strict products liability improper design claim is dismissed with leave to replead.[13]

## V.   Negligence

Tuosto next alleges that PM USA was negligent in designing its cigarettes, was negligent in failing to warn of the health risks of smoking, and negligently misrepresented that its cigarettes were safe. PM USA disputes these claims, arguing that Tuosto's negligent design claim fails for the same reasons that his products liability improper design claim does, that Tuosto's negligent failure to warn claim is pre-empted by the CLAA, and that Tuosto's claim for negligent misrepresentation fails for the same reasons his fraud claim fails.

---

[13] The Court also notes three very recent cases that address products liability improper design claims against tobacco companies: Fabiano v. Philip Morris, No. 102715/04 (N.Y. Sup. Ct. Aug. 1, 2007), Clinton v. Brown & Williamson Holdings, Inc., No. 05-9907 (S.D.N.Y. Jul. 23, 2007) (Brieant, J.), and Mulholland v. Philip Morris, No. 05-9908 (S.D.N.Y. 2007) (Brienat, J.). These cases come to differing conclusions regarding whether the plaintiff in each presented questions of fact that should be sent to a jury. Here, Tuosto has failed to present an expert opinion and hence has failed to meet the general requirements of an adequate pleading. See In re Tamoxifen Litig., 429 F.3d at 384-85 (2d Cir. 2005). Since Tuosto has leave to replead his strict products liability improper design claim, this Court gives Tuosto the opportunity to introduce evidence that could raise an issue of fact as to whether PM USA refused to adopt available safer technology in manufacturing its cigarettes.

A.   <u>Negligent Design</u>

According to New York law, "[b]oth negligence and strict products liability . . . require a showing of a product defect." <u>Kosmynka</u>, 462 F.3d at 86.  Furthermore, "[t]o prove negligent design, a plaintiff must demonstrate that the injury was reasonably foreseeable to the manufacturer, that the product defect was a 'substantial factor in causing the injury . . . and that 'it was feasible to design the product in a safer manner.'" <u>Id.</u> at 80 (quoting <u>Voss</u>, 59 N.Y.2d at 102).

As the Court previously held, Tuosto's negligent design claim shows neither a product defect specific to the cigarettes the Rita Tuosto smoked nor a feasible safer alternative design to the cigarettes that Rita Tuosto smoked.  Thus, for the reasons stated in the Court's analysis of Tuosto's strict liability claim of improper design, Tuosto's negligent design claim is also dismissed with leave to replead.

B.   <u>Negligent Failure to Warn</u>

A manufacturer does have a "'duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known.'" <u>Kosmynka</u>, 462 F.3d at 80. (quoting <u>Liriano v. Hobart Corp.</u>, 92 N.Y.2d 232 (N.Y. 1998)). However, Tuosto's negligent failure to warn claim would impose an affirmative duty on PM USA to include stronger and more specific warnings relating to smoking and health on PM USA's

34

products and in PM USA's advertisements.   Since the CLAA pre-empts regulations of advertising and promotion of cigarettes based on smoking and health, Tuosto's negligent failure to warn claim is pre-empted by the CLAA just as his products liability failure to warn claim was. See Cipollone, 505 U.S. at 515, 524. PM USA's motion is therefore granted and Tuosto's negligent failure to warn claim is dismissed with prejudice.

C.    Negligent Misrepresentation

In order for Tuosto to state a claim for negligent misrepresentation he must show (1) that PM USA "had a duty, as a result of a special relationship, to give correct information," (2) that PM USA "made a false representation that [PM USA] should have known was incorrect," (3) that PM USA knew that the information it supplied was "desired by [Tuosto] for a serious purpose," (4) that Tuosto "intended to rely and act upon it," and (5) that Tuosto "reasonably relied on it to [Tuosto's] detriment." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citing King v. Crossland Sav. Bank, 111 F.3d 251, 257-58 (2d Cir. 1997)).   The Court is also mindful that a claim of negligent misrepresentation must be pleaded with particularity pursuant to Rule 9(b). See Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 578-79, 583 (2d Cir. 2005).

The first element of a negligent misrepresentation claim

35

requires "'actual privity of contract between the parties or a
relationship so close as to approach that of privity.'" In re
Time Warner Inc., Secs. Litig., v. Ross, 9 F.3d 259, 271 (2d
Cir. 1993) (Newman, J.) (quoting Ossining Union Free Sch. Dist.
v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 419 (N.Y. 1989));
see also Prudential Ins. Co. of America v. Dewey, Ballantine,
Bushby, Palmer & Wood, 80 N.Y.2d 377, 382 (N.Y. 1992).  The
requirement of privity stems from the need to "provide fair and
manageable bounds to what otherwise could prove to be limitless
liability." Prudential Ins. Co., 80 N.Y.2d at 382.  There is no
privity where there is no contact between parties and where the
defendant had no knowledge of the identity of the specific
plaintiff. See Metral v. Horn, 213 A.D.2d 524, 526 (N.Y. App.
Div. 1995).  Furthermore, "mass communication cannot establish
privity with unidentified members of the public." McGill v. Gen.
Motors Corp., 231 A.D.2d 449, 450 (N.Y. App. Div. 1996).  Tuosto
does not allege that PM USA knew of Rita Tuosto specifically and
his references to mass advertising campaigns undertaken by PM
USA cannot establish privity between PM USA and Rita Tuosto.
Consequently, Tuosto has failed to establish privity of contract
with PM USA.

However, according to the New York Court of Appeals, there
are three factors that can be used to determine whether, in the
absence of privity of contract, a party's reliance is justified:

36

"whether the person making the representation held or appeared
to hold unique or special expertise; whether a special
relationship of trust or confidence existed between the parties;
and whether the speaker was aware of the use to which the
information would be put and supplied it for that purpose."
Kimmel v. Schafer, 89 N.Y.2d 257, 264 (N.Y. 1996).  Generally,
an arms-length commercial transaction, without more, does not
give rise to a special duty to speak with care.  See EED Holdings
v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265, 281
(S.D.N.Y. 2004) (Sweet, J.) (citing Kimmel, 675 N.E.2d at 454).
Here, Tuosto's claim of negligent misrepresentation fails for a
variety of reasons.  First, while he cannot show privity of
contract, he also fails to assert the special relationship that
is essential to establish a claim for negligent
misrepresentation.  Tuosto fails to allege any special
relationship; there is clearly, here, alleged only an arms
length commercial transaction. Id.  Moreover, as the Court found
in its discussion of Tuosto's fraud claim, Tuosto's claims
regarding alleged fraudulent statements to consumers and the
public do not meet the specificity requirements of rule 9(b).

    As has been mentioned previously, Rule 9(b) requires that
"[i]n averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with
particularity." Fed. R. Civ. P. 9(b).  Specifically, Rule 9(b)

requires the complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills, 12 F.3d at 1175. A plaintiff must also show that defendant acted with fraudulent intent, showing that the defendant "had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." Fluor Corp., 808 F.2d at 962.

Tuosto meets none of the requirements of Rule 9(b). As the Court held previously, Tuosto fails to stipulate the statements that he alleges were fraudulent, fails to confirm the speaker, fails to make known when and where the statements were made, and fails to explain why the statements were fraudulent. Instead, Tuosto makes conclusory allegations without setting forth any facts upon which this Court can find that PM USA violated the law. See In re Tamoxifen Litig., 429 F.3d at 384-85.

Because Tuosto fails to prove the existence of a special relationship between Rita Tuosto and PM USA and also fails to plead negligent misrepresentation with the specificity demanded by Rule 9(b), Tuosto's negligent misrepresentation claim is dismissed with leave to replead. See Alcito, 47 F.3d at 54-55 ("Leave to amend should be freely given especially where dismissal of the complaint [is] based on Rule 9(b).")

38

VI.   <u>Loss of Consortium</u>

Tuosto's action for loss of consortium "is derivative, and not independent." <u>Young v. Robertshaw Controls Co.</u>, 104 A.D.2d 84, 88 (N.Y. App. Div. 1984) (citing <u>Liff v. Schildkrout</u>, 49 N.Y.2d 622, 632-633; <u>Osborn v. Kelley</u>, 61 A.D.2d 367, 370). Since the Court has granted PM USA's motion for judgment on the pleadings with respect to Tuosto's fraud, concerted action, strict products liability, and negligence claims, the estate of Rita Tuosto has no cause of action to recover for her death, and therefore John Tuosto also "has no derivative right to recover for loss of consortium due to that death." <u>Id.</u>  Tuosto's loss of consortium claim is dismissed with leave to replead.

VII. <u>Wrongful Death</u>

Tuosto's claim for wrongful death is also derivative. In New York, a wrongful death action can only be maintained if the defendant "would have been liable to an action in favor of the decedent . . . if death had not ensued.'" <u>Emery v. Rochester Tel. Corporation</u>, 271 N.Y. 306, 309 (N.Y. 1936) (citing Decedent Estate Law, § 130); <u>see</u> <u>also</u>, NY EPTL § 5-4.1 (stating that a cause of action for wrongful death can only be maintained if the defendant would be liable to decedent if death had not ensued). Since the Court has dismissed all of Tuosto's claims against PM USA for Rita Tuosto's death, Tuosto's wrongful death claim is dismissed with leave to replead.

**CONCLUSION**

For the foregoing reasons, Tuosto's fraud and negligent misrepresentation claims, his strict products liability improper design and negligent design claims, and his concerted action claims are all dismissed with leave to replead, except no leave to replead is granted where the Court has indicated that Tuosto's claims are barred by <u>Noerr-Pennington</u> or the CLAA. Tuosto's strict products liability failure to warn and negligent failure to warn claims are dismissed without leave to replead. Tuosto's derivative claims of loss of consortium and wrongful death are dismissed with leave to replead.

**SO ORDERED.**
**New York, New York**

August  **21** , 2007

_____
U.S.D.J.

40

Copies of this Opinion and Order have been sent to:

Joseph M. Lichtenstein, Esq.
LAW OFFICES OF JOSEPH M. LICHTENSTEIN, P.C.
170 Old Country Road
Suite 301
Mineola, New York 11501


Scott E. Hershman, Esq.
Stephen R. Blacklocks, Esq.
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166