UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN TUOSTO as proposed
Administrator of the Estate of
RITA TUOSTO and JOHN TUOSTO,
Individually,

Plaintiff,

- against -

PHILIP MORRIS USA INC.,

Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/19/09
```

OPINION AND ORDER

05 Civ. 9384 (PKL)

*APPEARANCES*

LAW OFFICES OF JOSEPH M. LICHTENSTEIN, P.C.
170 Old Country Road
Suite 301
Mineola, New York 11501
Joseph M. Lichtenstein, Esq.

Attorneys for Plaintiff


HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166
Scott E. Hershman, Esq.
Stephen R. Blacklocks, Esq.

Attorneys for Defendant Philip Morris USA Inc.

Plaintiff John Tuosto brings this suit individually and as the administrator of the estate of his deceased wife, Rita Tuosto (collectively, "Tuosto").  Rita Tuosto allegedly smoked cigarettes manufactured by Defendant Philip Morris USA Incorporated ("PM USA") from the late 1960s or early 1970s until her death on October 5, 2003. Tuosto alleges that PM USA's cigarettes caused Rita Tuosto's death, giving rise to five causes of action: fraud and misrepresentation; strict liability for design defect; negligence; loss of consortium; and wrongful death.

On August 21, 2007, the Court granted PM USA's motion to dismiss Tuosto's First Amended Complaint and granted Tuosto leave to replead some, but not all, of his original claims.  Tuosto v. Philip Morris USA Inc. (Tuosto I), No. 05 Civ. 9384, 2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007). Tuosto filed a Second Amended Complaint, and PM USA, in turn, made a renewed motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons set forth herein, the Court grants PM USA's Motion and dismisses Tuosto's claims with leave to replead.

1

## BACKGROUND

### I.  Prior History

Tuosto initiated this action in New York state court in September 2005.  On November 4, 2005, PM USA removed the action to this Court pursuant to 28 U.S.C. § 1441. Following removal, PM USA moved to dismiss Tuosto's Amended Complaint pursuant to Fed. R. Civ. P. 12(c).  Tuosto asserted six causes of action in his First Amended Complaint:  fraud and misrepresentation; concerted action;[1] strict products liability for defective design, failure to warn and failure to test;[2] negligence; loss of consortium; and wrongful death.  In its decision of August 21, 2007, the Court dismissed all of Tuosto's claims.  See Tuosto I, 2007 WL 2398507.

The Court gave Tuosto leave to replead most of his causes of action, but explicitly denied this leave for certain claims.  Specifically, the Court held that some elements of Tuosto's claims of fraud were barred by the Noerr-Pennington doctrine and the Cigarette Labeling and Advertising Act ("CLAA").  Tuosto I, 2007 WL 2398507, at *5-6.  The Noerr-Pennington doctrine bars civil actions

---

[1] Tuosto does not replead this cause of action in his Second Amended Complaint.
[2] Because "failure to test" is not a cognizable claim under New York products liability law, the Court treated this claim as an element of Tuosto's defective design claim.  Tuosto I, 2007 WL 2398507, at *11 n.11.

2

challenging conduct that constitutes "petitioning legislatures, administrative bodies, [or] the courts." Id., at *5 (quoting Hamilton v. Accu-Tek, 935 F. Supp. 1307, 1316-17 (E.D.N.Y. 1996)). The Court held that Tuosto's allegations stemming from PM USA's representations to Congress did not fall under the doctrine's exceptions, and thus were barred. Id., at *5-6.

Tuosto was also denied leave to replead elements of his fraud claims that were pre-empted by the CLAA. Id., at *6-7. The CLAA established "a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health . . . ." 15 U.S.C. § 1331. As discussed at greater length below, this Act pre-empts common law actions for damages predicated on a legal duty that "constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising and promotion' . . . ." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 524 (1992) (ellipses in original). Tuosto repeats, and indeed amplifies, the claims that the Court found pre-empted in its 2007 decision.

The Court further dismissed with prejudice Tuosto's claims of strict products liability and negligent failure to warn. Tuosto I, 2007 WL 2398507, at *11, 14. These

claims rely on the existence of a duty owed by PM USA "to include stronger and more specific warnings relating to smoking and health on PM USA's products and in PM USA's advertisements." Id., at *14. Such claims are explicitly barred by the CLAA. See id., at *11. Tuosto does not replead these claims in his Second Amended Complaint.

II.  The Parties

For the purposes of a motion to dismiss, the Court takes all "well-pleaded factual allegations" as true. See Selevan v. N.Y. Thruway Auth., No. 07-0037-cv, 2009 WL 3296659, at *2 (2d Cir. Oct. 15, 2009) (quoting Ashcroft v. Iqbal, ---U.S. ---, 129 S. Ct. 1937, 1950 (2009)). The following facts are taken from Plaintiff's pleadings and do not constitute findings of the Court. The Court notes that Tuosto does not allege substantially different facts from those in his First Amended Complaint. See Tuosto I, 2007 WL 2398507, at *1-3.

Plaintiff Rita Tuosto was born in New York in 1956 and remained a resident of that state for her entire life. (Second Am. Compl. ¶ 9.) She began smoking in her teen years and was unable to quit despite efforts to do so. (Id.) Rita Tuosto always smoked cigarettes manufactured by PM USA. (Id.) In 2003, Rita Tuosto was diagnosed with

4

lung cancer and died on October 5 of that year.  (Id. ¶ 10.)  Plaintiff John Tuosto married the decedent in 1980 and the two remained married until Rita Tuosto's death.  (Id. ¶ 12.)  He is now the proposed administrator of her estate.  (Id. ¶ 11.)

PM USA is a Virginia corporation with its principal place of business in the State of New York and which regularly does and solicits business in the State of New York.  (Id. ¶¶ 13-14.)  PM USA manufactures cigarettes, including the "Philip Morris" and "Marlboro" brands.  (Id. ¶ 13.)

Tuosto's factual allegations can be separated into two broad categories.  First, Tuosto makes a series of allegations related to PM USA's knowledge of the health risks of cigarettes and communications with customers regarding these risks.  Second, Tuosto makes allegations regarding the health and physiological effects of cigarettes, and especially nicotine, as well as PM USA's cigarette manufacturing process.  The Court assumes these well-pleaded facts to be true for the purposes of this motion to dismiss.

III. <u>PM USA's Research and Representations to Customers</u>

PM USA has advertised its cigarette brands using, for example, point of purchase marketing and the iconic image of the "Marlboro Man." (<u>Id.</u> ¶¶ 20-23, 127-28, 139.) Tuosto alleges that PM USA has also paid to have its products featured in movies and television programs. (<u>Id.</u> ¶¶ 129-39.)

Tuosto alleges that PM USA has been concerned about the health implications of cigarettes and the potentially deleterious effects of these implications upon its business since the 1930s. (<u>See</u> <u>id.</u> ¶ 24.) These concerns increased in the early 1950s after the publication of two major studies that highlighted the health dangers of smoking. (<u>See</u> <u>id.</u> ¶¶ 37-38.) On December 15, 1953, after the release of these studies, the presidents of leading tobacco companies met at the Plaza Hotel in New York City along with the public relations agency Hill and Knowlton. (<u>Id.</u> ¶ 39.) At this meeting, and through subsequent communications, the leaders of the tobacco companies and Hill and Knowlton discussed the appropriate public relations stance for the industry to take in response to these studies. (<u>Id.</u> ¶¶ 39-41.) As a result of this meeting, the Tobacco Industry Research Committee ("TIRC") was established on December 15, 1953. (<u>Id.</u> ¶¶ 42-45.) In

6

1964, the TIRC changed its name to the Council for Tobacco Research-USA ("CTR").  (Id. ¶ 46.)

On January 4, 1954, PM USA and other cigarette manufacturers released "A Frank Statement to Cigarette Smokers," a full-page newspaper advertisement that appeared in 448 newspapers across the United States, and that announced the formation and purpose of the TIRC.  (Id. ¶ 49.)  The advertisement stated that TIRC would be established as a way for the cigarette companies to assist in the research on the relationship between tobacco use and health.  (Id. ¶ 50.)

In 1962, two independent researchers stated that quitting smoking could reduce the chances of cancer in ex-smokers; however, PM USA did not inform the public of these findings.  (Id. ¶ 121.)

In 1958, the tobacco companies formed a trade association named the Tobacco Institute ("TI").  (Id. ¶ 47.)  In 1970, the TI ran an advertisement entitled "A Statement About Tobacco and Health."  (Id. ¶ 53.)  This advertisement stated that the TI assisted scientists in researching tobacco, health, and certain diseases that had been linked to tobacco use.  (Id.)  The TI released additional advertisements in 1970.  (Id. ¶ 54.)  One such unidentified advertisement stated that the tobacco industry

7

supported research into the link between tobacco and
health.  (Id.)

Internal industry documents created between 1956 and
1981 reveal that industry insiders were aware at the time
of possible links between cancer and cigarette smoking.
(Id. ¶¶ 64-73.)  These documents also reveal that insiders
knew that the CTR and other tobacco trade associations were
not impartial.  (Id.)  In 1993, a former 24-year employee
of CTR publicly revealed that CTR was, in fact, a lobby for
cigarette companies.  (Id. ¶ 71.)


IV.  Nicotine and the Cigarette Manufacturing Process

Nicotine, which is found in cigarettes, has been
recognized as addictive and as having adverse health
consequences by medical organizations such as the Office of
the U.S. Surgeon General, the World Health Organization,
the American Medical Association, the American Psychiatric
Association, the American Psychological Association, the
American Society of Addiction Medicine, and the Medical
Research Council in the United Kingdom.  (Id. ¶¶ 86-90.)
PM USA has known of nicotine's addictive properties since
at least 1960, as evidenced by a series of internal
reports.  (Id. ¶¶ 90-95.)  Researchers working for PM USA
confirmed the addictive properties of nicotine, but in 1984

were told to halt their research and were forced to sign
confidentiality agreements.  (Id. ¶ 95.)

The nicotine level in American tobacco plants has
increased between 10% and 50% from 1955 to 1980.  (Id. ¶
99.)  PM USA allegedly can manipulate the nicotine content
in its cigarettes by altering the design and manufacture of
the cigarettes.  (Id. ¶¶ 100-08.)  Plaintiff alleges that
PM USA, along with other tobacco companies, aggressively
manipulates the nicotine levels in its cigarettes.  (See
id. ¶ 110.)  However, in April 1994 PM USA ran an
advertisement that appeared in newspapers across the
country and affirmatively represented that PM USA did not
manipulate nicotine levels in its cigarettes and did not
believe that cigarette smoking was addictive.  (Id. ¶ 119.)
Instead, PM USA describes the role of nicotine as
"satisfaction," "impact," "strength," "rich aroma," and
"pleasure." (Id. ¶ 98.)

PM USA has developed a range of products that
supposedly deliver less tar and nicotine to smokers.  So-
called "light" cigarettes were designed to target health-
conscious smokers; however, these cigarettes in fact may
deliver higher concentrations of nicotine and tar than
regular cigarettes.  (Id. ¶¶ 110-17.)  PM USA has also
developed other physiologically "safer" cigarettes that it

never marketed aggressively.  In 1964, a research and development presentation to PM USA's Board of Directors revealed that a "[p]hysiologically ... outstanding cigarette" known as "Saratoga" had been developed but that "[t]he product as test marketed didn't have good 'taste' and consequently was unacceptable to the public ignorant of its physiological superiority."  (Id. ¶ 84.)  PM USA also developed "Next," a cigarette that did not contain nicotine, which the Defendants allegedly believed to have an unacceptable taste.  (Id. ¶¶ 188-90.)

## DISCUSSION

### I.   Standard of Review

The Court reviews Tuosto's claims assuming "all 'well-pleaded factual allegations' to be true[ in order to] 'determine whether they plausibly give rise to an entitlement to relief.'"  Selevan, 2009 WL 3296659, at *2 (quoting Iqbal, 129 S. Ct. at 1950).[3]  In Iqbal, the Supreme

---

[3] The parties fully briefed this motion prior to the Supreme Court's Iqbal decision, but after Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), which introduced the plausibility standard of review for motions to dismiss.  As the parties have not requested to submit additional briefing, the Court will apply the standard of review from Iqbal, which "amplifies and expands" on the reasoning of Twombly but "introduces no new concepts." United States v. Lloyds TSB Bank PLC, 639 F. Supp. 2d 326, 336 (S.D.N.Y. 2009) (applying Iqbal to motion that was fully briefed after Twombly was decided but prior to the Supreme Court's May, 2009, decision in Iqbal).

Court suggested that courts employ a two-pronged analysis
to determine if pleadings meet this plausibility standard.
First, a court "can choose to begin by identifying
pleadings that, because they are no more than conclusions,
are not entitled to the assumption of truth." Iqbal, 129
S. Ct. at 1950; see also, United States v. Lloyds TSB Bank
PLC, 639 F. Supp. 2d 326, 338-39 (S.D.N.Y. 2009) (same).
Second, "[w]hen there are well-pleaded factual allegations,
a court should assume their veracity and then determine
whether they plausibly give rise to an entitlement to
relief." Iqbal, 129 S. Ct. at 1950; see also, Lloyds TSB,
639 F. Supp. 2d at 338-39 (same). Although the Supreme
Court suggested this approach, it explicitly recognized
that "[d]etermining whether a complaint states a plausible
claim for relief will . . . be a context-specific task that
requires the reviewing court to draw on its judicial
experience and common sense." Iqbal, 129 S. Ct. at 1950;
S. Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 110
(2d Cir. 2009) (same).

        The Court now turns to evaluate each of Plaintiff's
claims in turn.

II.   Fraud and Misrepresentation

Tuosto's first cause of action alleges that PM USA
made fraudulent misrepresentations "relating to the issue
of smoking and health" and "relating to the industry's
false promises to conduct and disclose objective research."
(Second Am. Compl. ¶ 126.)   Tuosto also alleges that PM USA
fraudulently concealed material facts relating to the issue
of smoking and health.   (Id.)   Because these claims
implicate PM USA's communications with the public through
advertising, the Court must first determine the pre-emptive
effect of the Cigarette Labeling and Advertising Act
("CLAA").

A.   CLAA Pre-Emption

Congress enacted the CLAA in 1965 in response to a
determination by the Surgeon General that smoking was
harmful to health.   See Altria Group, Inc. v. Good, ---
U.S. ---, 129 S. Ct. 538, 543 (2008).   The Act was
significantly amended by the Public Health Cigarette
Smoking Act of 1969.   Pub. L. No. 91-222, 84 Stat. 87, as
amended 15 U.S.C. §§ 1331-1340; Tuosto I, 2007 WL 2398507,
at *6-7.   The CLAA established "a comprehensive Federal
program to deal with cigarette labeling and advertising
with respect to any relationship between smoking and

12

health" with the twin aim of informing the public about
these risks, and protecting against impediments to national
commerce from potentially diverse state regulations.  15
U.S.C. § 1331.  To ensure that this second goal was met,
Section 5(b) of the Act pre-empted positive enactments of
state law ordering that cigarettes contain additional
warning labels.  15 U.S.C. § 1334; see Cipollone v. Liggett
Group, Inc., 505 U.S. 504, 518-19 (1992).  Congress
subsequently amended the Act to prohibit cigarette
advertising in electronic media and to require additional
explicit warnings on packaging and in advertising.  See
Altria, 129 S. Ct. at 543-44.

     The 1969 amendment strengthened the pre-emption
language of the act, contained in 15 U.S.C. § 1334.  In
Cipollone, a plurality of the Supreme Court concluded that
this amended language pre-empted common law actions for
damages predicated on a legal duty that "constitutes a
'requirement or prohibition based on smoking and health . .
. imposed under State law with respect to . . . advertising
and promotion' . . . ."  505 U.S. at 524 (ellipses in
original).  However, not all common law claims fall within
the Act's pre-emptive scope.  The plurality concluded that
claims of fraudulent concealment were not pre-empted
"insofar as those claims rely on a state-law duty to

                              13

disclose such facts through channels of communication other than advertising or promotion." Id. at 528. Similarly, a claim of fraudulent misrepresentation was permitted since it was based "on a more general obligation—the duty not to deceive." Id. at 528-29. Unlike claims alleging negation of federally mandated health warnings, claims of fraud "rely only on a single, uniform standard:  falsity," and thus are not preempted. Id. at 529. In 2008, a majority of the Supreme Court adopted Cipollone's plurality opinion. Altria, 129 S. Ct. at 551.

Thus, in order to determine if the CLAA pre-empts a particular common law claim, the Court shall inquire "'whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading." Id. at 545 (quoting Cipollone, 505 U.S. at 524); Clinton v. Brown & Williamson Holdings, Inc., No. 05-CV-9907, 2009 WL 2877617, at *5 (S.D.N.Y. Sept. 8, 2009).

Turning to the present case, Tuosto's first cause of action asserts that PM USA made a variety of fraudulent statements through multiple parties and channels, allegedly negating causal connections between smoking and health.

14

This claim is founded squarely upon a duty based on smoking and health, as Tuosto alleges that, in its advertising, PM USA failed to disclose material facts concerning the risks of smoking.  Therefore, the CLAA explicitly pre-empts this claim insofar as it relates to PM USA's advertising or promotion.[4]  See Cipollone, 505 U.S. at 527-28; Tuosto I, 2007 WL 2398507, at *7 ("Because this allegation is predicated on Tuosto's belief that PM USA had a duty to advertise and label cigarettes in a specific manner, and is presented as a duty based on 'smoking and health,' it is pre-empted by the CLAA.").

Regarding Plaintiff's remaining fraud claims, the CLAA does not pre-empt Tuosto's claim related to PM USA's allegedly fraudulent promises to conduct and disclose objective research.  Second Am. Compl. ¶ 126; Tuosto I, 2007 WL 2398507, at *7.  This claim is not confined to the specific channels covered by the CLAA—advertising and promotion.  See Grill v. Philip Morris USA, Inc., No. 05-CV-9174, 2009 WL 2877607, at *6 (S.D.N.Y. Sept. 8, 2009) (distinguishing Cipollone and Altria by holding that the

---

[4] In addition to PM USA's traditional advertising, Tuosto alleges that PM USA marketed its cigarettes by having them featured in movies and television programs.  Neither party has addressed whether such product placement is considered "advertising" for the purposes of the CLAA.  Because the Court dismisses this claim for numerous other deficiencies, it need not determine if these alleged product placements are pre-empted.

plaintiff did not allege that the defendant should have disclosed additional facts through advertising or promotion). Moreover, the claim is predicated on the duty not to deceive, rather than a duty "based on smoking and health . . . with respect to . . . advertising or promotion." Altria, 129 S. Ct. at 545.

Tuosto's claim of fraudulent concealment is similarly not pre-empted by the CLAA. Second Am. Compl. ¶ 126; Tuosto I, 2007 WL 2398507, at *7. This claim does not relate to advertising and promotion, but instead to PM USA's failure to disclose material facts through other channels. See Grill, 2009 WL 2877607, at *6. Like Tuosto's allegation that PM USA fraudulently promised to conduct research, this claim is also founded on the more general duty not to deceive-a duty left undisturbed by CLAA preemption. See Altria, 129 S. Ct. at 545; see also Grill, 2009 WL 2877607, at *7 (applying Altria).

For the foregoing reasons Tuosto's claims of fraudulent advertising and promotion are dismissed as preempted by the CLAA, while the claims of fraud based on an alleged failure to conduct and disclose objective research and fraudulent concealment are not preempted. The Court now turns to the substance of Tuosto's claims of fraud that are not preempted by the CLAA.

16

B.    Fraud:  Elements and Pleading Standard

    The five elements of a fraud claim under New York law are:

>     (1) a material misrepresentation or omission of
>     fact (2) made by defendant with knowledge of its
>     falsity (3) and intent to defraud; (4) reasonable
>     reliance on the part of the plaintiff; and (5)
>     resulting damage to the plaintiff.

Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 235 (2d Cir. 2006); see also Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (McLaughlin, J.). Alleged misrepresentations need not be made directly by the defendant, for "'[i]f [defendant] authorized and caused [the statement] to be made it is the same as though he made it himself.'"  In re Simon II Litigation, 211 F.R.D. 86, 140 (E.D.N.Y. 2002), vacated on other grounds, 407 F.3d 125 (2d Cir. 2005) (quoting Kuelling v. Roderick Lean Mfg. Co., 183 N.Y. 78, 85, 75 N.E. 1098, 1100 (1905)).

    In addition to these requirements, plaintiffs must plead fraud with particularity.  Fed. R. Civ. P. 9(b); see also Tuosto I, 2007 WL 2398507, at *8.  Courts read Rule 9 in conjunction with the general pleading standards of Rule 8; however, the specificity requirement of Rule 9 is a

17

distinct requirement.  See IUE AFL-CIO Pension Fund v.

Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993); Miller v.

Holtzbrinck Publishers, LLC, No. 08 Civ. 3508, 2009 WL

528620, at *4 (S.D.N.Y. Mar. 3, 2009).  To satisfy the

requirement of Rule 9, a claim must:  "'(1) specify the

statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements

were fraudulent.'"  Rombach v. Chang, 355 F.3d 164, 170 (2d

Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d

1170, 1175 (2d Cir. 1993)).  Rule 9 allows plaintiffs to

plead scienter generally, but this Circuit requires

"plaintiffs to allege facts that give rise to a strong

inference of fraudulent intent."  Shields v. Citytrust

Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (citations

omitted).  This heightened pleading requirement is

"'designed to provide a defendant with fair notice of a

plaintiff's claim in order to enable a defendant to prepare

a defense, protect defendant's reputation or goodwill from

harm, and reduce the number of strike suits.'"  Kermansah v.

Kermansah, 580 F. Supp. 2d 247, 257 n.15 (S.D.N.Y. 2008)

(quoting O'Brien v. Nat'l Prop. Analysts Partners, 719 F.

Supp. 222, 225 (S.D.N.Y. 1989) (Leisure, J.)).

C.    Specific Claims of Fraud

1.    Fraudulent Misrepresentation:   Smoking and Health

Tuosto alleges that PM USA made fraudulent statements
regarding the effects of smoking on health, and similarly
misleading statements regarding PM USA's commitment to
performing objective research on these effects.   (Second
Am. Compl. ¶¶ 126(a)-(b).)   Defendant allegedly made these
representations through its own advertising, other public
statements and through third parties.   PM USA moves to
dismiss these complaints on three grounds.   First, PM USA
argues that the alleged misstatements are pre-empted by the
CLAA.   (Mem. in Support of PM USA's Mot. to Dismiss the
Second Am. Compl. ("Def.'s Mem. in Supp.") 4-5.)   Second,
PM USA argues that Tuosto does not sufficiently plead that
any misrepresentations allegedly made by PM USA were
material.   (Id. at 5-6.)   Finally, PM USA argues that
Tuosto does not allege that Tuosto's alleged reliance on
any misrepresentations was reasonable.   (Id. at 6-7.)

This Court's 2007 decision dismissed Plaintiff's fraud claims that were not preempted or protected[5] for failing to meet Rule 9(b)'s particularity requirement, as Tuosto did not identify particular representations made by PM USA. See Tuosto I, 2007 WL 2398507, at *8-9. In his Second Amended Complaint, Tuosto has elaborated on these allegations, claiming that PM USA made the alleged misrepresentations through:  advertisements containing the Marlboro Man, product placements in television and movies, and actions of the CTR.

Tuosto's claims based on Marlboro Man advertisements are pre-empted, as held above.  See supra Section II.A. These claims solely allege that PM USA negated federally mandated warnings in its advertising and are squarely within the pre-emptive scope of the CLAA.  See Cipollone, 505 U.S. at 527-28; Tuosto I, 2007 WL 2398507, at *7.

As for the film product placement allegations, Tuosto identifies only three alleged misrepresentations with particularity, and even in these cases, does not identify

---

[5] This Court's August 2007 opinion dismissed Plaintiff's allegations that PM USA executives made false and misleading statements to Congress because these statements were protected by the Noerr-Pennington doctrine.  Tuosto I, 2007 WL 2398507, at *4-6.  Plaintiff repeats these protected allegations in its Second Amended Complaint despite the Court's earlier ruling. (See Second Am. Compl. ¶¶ 57-59, 87, 95-97, 118.)  The Court reiterates its prior ruling that these allegations are dismissed under the Noerr-Pennington doctrine.

when or where decedent saw these films.[6]   First, Tuosto

alleges that PM USA paid $350,000 for its cigarettes to be

smoked by the "handsome[,] exciting" James Bond character,

as well as by the female lead in the movie "License to

Kill."  (Second Am. Compl. ¶ 133.)  This allegation

properly specifies a particular representation and speaker,

yet it fails to properly allege fraudulent intent as

required by Rule 9(b).  Tuosto must plead sufficient facts

to give rise to a strong inference of fraudulent intent on

the part of PM USA.  See Shields, 25 F.3d at 1128.  Rather

than alleging specific facts, however, Tuosto simply

asserts that the depiction of smoking in "License to Kill"

was "designed to make children start smoking, and to have

those like the decedent who was already addicted to

cigarettes continue in their behavior."  (Id. ¶ 133.)  This

allegation is wholly conclusory in nature and fails to meet

the plausibility standard that applies to all pleadings.

As this Circuit has held, a plaintiff cannot simply twin "a

factual statement with a conclusory allegation of

fraudulent intent."  Shields, 25 F.3d at 1129.  Tuosto

---

[6] Tuosto also includes a laundry list of television programs and films in which female characters used cigarettes, allegedly at PM USA's behest.  (Second Am. Compl.  ¶¶ 131-32.)  These allegations fail to approach the required specificity of Rule 9(b).  They do not cite specific statements, nor do they explain why the claims were fraudulent.  Further, Tuosto's allegation of PM USA's role in causing these representations is wholly conclusory, failing to satisfy the plausibility standard necessary to avoid dismissal.

hazards this pleading technique here, yet fails to allege plausible facts sufficient to support even conclusory allegations of intent.

Second, Tuosto alleges that PM USA paid $42,500 for the Lois Lane character to smoke throughout the movie "Superman 2" and to have its brand featured during the film. (Second Am. Compl. ¶ 134.) Tuosto alleges that the representation of an "energetic, smart, exciting news reporter" smoking cigarettes constituted a fraudulent misrepresentation. (Id.) This allegation, like that regarding the "License to Kill" film, fails to plead fraudulent intent sufficiently.

Third, Tuosto alleges that a specific scene in the first "Superman" film constituted fraudulent misrepresentation. In that film, the title character uses X-Ray vision to inspect Lois Lane's lungs, finding that she had "not yet" developed lung cancer. (Id. ¶ 134; Def.'s Mem. in Supp. 7.) PM USA argues in response that any reliance on this representation could not be reasonable. (Def.'s Mem. in Supp. 6-7.) However, the Court need not reach the issue of reliance, for Plaintiff has not alleged that this representation was made at the behest of PM USA. Plaintiff specifically alleges that PM USA paid $42,500 to have its products featured in "Superman 2." Tuosto makes

no such accusation regarding the first "Superman" film.
(See Second Am. Compl. ¶¶ 134-36; see also Mem. In Op. to
PM USA's Mot. to Dismiss the Second Am. Compl. ("Pl.'s Mem.
in Op.") 7-8.)  Any suggestion that PM USA caused the X-Ray
vision scene to be depicted in the first "Superman" film is
wholly conclusory and unsupported by any factual
allegations.  Without the specific "Superman 2" allegation,
Tuosto's claims do not satisfy Rule 9(b)'s standards:  he
has not specified when or where Rita Tuosto saw these
misrepresentations, and has failed to plead scienter
adequately.

     In addition to the product placement claims, Tuosto
alleges that PM USA made statements causing the decedent
"to doubt that cigarettes caused cancer" through public
pronouncements of the CTR, of which PM USA was a member and
contributor.  (Second Am. Compl. ¶¶ 140-41.)  Allegations
that such statements negated the effectiveness of
government warnings regarding smoking are not barred by the
CLAA because they were allegedly made through channels
other than advertising or promotion.  See Cipollone, 505
U.S. at 527-29; see also Grill, 2009 WL 2877607, at *6
(holding that the CLAA did not pre-empt a state law claim
based on a duty to disclose material facts through non-
advertising channels).

However, these allegations fail to meet the requisite
pleading standards to avoid dismissal for several reasons.
First, paragraphs 140 and 141 of the complaint do not add
to the pleadings this Court considered and dismissed in
2007.  Most of the language in these paragraphs repeats
verbatim the allegations of paragraphs sixty-nine to
seventy-two of Tuosto's dismissed First Amended Complaint.
Plaintiff's repetition of these claims does not alter the
Court's original determination that they fail to state an
adequate claim.  See Tuosto I, 2007 WL 2398507, at *8-9;
see also United States ex rel Taylor v. Gabelli, 345 F.
Supp. 2d 313, 318 n.5 (S.D.N.Y. 2004) (refusing to address
an argument for dismissal on which another District Court
had already ruled because the parties had presented no
additional facts).  Second, Tuosto wholly fails to refer to
specific representations made by PM USA and instead vaguely
refers to statements made in "local Newspapers which
decedent read, magazines, and in magazines the decedent
read."  (Second Am. Compl. ¶ 141.)  These allegations fall
short of the mark set by Rule 9(b).  See In re Scholastic
Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001) ("The
complaint must identify the statements plaintiff asserts
were fraudulent and why, in plaintiff's view, they were
fraudulent, specifying who made them, and where and when

they were made."); cf., Ross v. A.H. Robins Co., 607 F.2d
545, 558 (2d Cir. 1979) (listing ten specific statements
the plaintiff had alleged were fraudulent).  Third,
Plaintiff has not pleaded additional facts sufficient to
reverse the Court's earlier holding that he had not tied PM
USA to the misrepresentations of the CTR, the TI, or other
industry organizations.  See Tuosto I, 2007 WL 2398507, at
*9 ("[T]he Complaint does not attribute this particular
advertisement [the TI advertisement "A Statement About
Tobacco and Health"] to PM USA directly.").  Finally, as
this Court concluded in its earlier decision, Plaintiff
fails to plead adequate scienter by PM USA.  See id.; see
also Miller, 2009 WL 528620, at *4 (failure to plead
scienter is fatal to a claim of fraud).

     For these reasons, Tuosto's claims of fraudulent
negation of the effects of cigarettes on health—through
advertising, through alleged product placement and through
alleged statements by the CTR—are dismissed.

2.   Fraudulent Misrepresentation:  Performing
     and Disclosing Research

Tuosto's second fraud claim alleges that PM USA falsely promised to conduct and disclose objective research.  (Second Am. Compl. ¶ 126(b).)  In the Court's prior decision, Tuosto's false promises claim was dismissed for failing to identify specific allegedly misleading statements; for failing to tie statements made by the TI to PM USA; for failing to plead scienter adequately; and for failing to plead reasonable reliance.  See Tuosto I, 2007 WL 2398507, at *8-9.  Plaintiff attempts to elaborate on the claims of his First Complaint in Paragraphs 140 and 141 of his Second Amended Complaint, but these paragraphs merely contain relocated allegations from Tuosto's prior complaint.  Tuosto cites a memorandum, allegedly written by a PM USA official, describing the CTR as an "industry shield."  (Id. ¶ 140.)  Tuosto also details public statements allegedly made by a former employee of the CTR stating that "'[w]hen CTR research found out that cigarettes were bad and it was better not to smoke, we didn't publicize that  . . . .'"  (Id. ¶ 141.)  The Court dismissed Tuosto's First Complaint based on these precise allegations and the Second Complaint does not plead additional facts sufficient to reverse the Court's earlier

determination that Tuosto fails to tie PM USA to alleged
misrepresentations of the CTR, the TI, or other industry
organizations.  See Tuosto I, 2007 WL 2398507, at *9.
Therefore, Tuosto's second claim of fraud for false
promises to conduct and disclose objective research is
dismissed.

   3.   Fraudulent Concealment

   Tuosto's third claim of fraud is that PM USA
fraudulently concealed facts relating to the issue of
smoking and health.  (Second Am. Compl. ¶ 126(c).)   To
state a claim for fraudulent concealment under New York
law, a plaintiff must allege the standard elements of
fraud:

   (1) a material misrepresentation or omission of
   fact (2) made by defendant with knowledge of its
   falsity (3) and intent to defraud; (4) reasonable
   reliance on the part of the plaintiff; and (5)
   resulting damage to the plaintiff.

Crigger, 443 F.3d at 235.  A plaintiff must also allege
that "defendant had a duty to disclose material
information."  Nealy v. U.S. Surgical Corp., 587 F. Supp.
2d 579, 585 (S.D.N.Y. 2008) (citations omitted).  A duty to
disclose will arise if parties are in a fiduciary
relationship; if one party has made a partial or ambiguous

27

statement that only complete disclosure of facts will elucidate fully; or if a party possesses superior knowledge, not available to the other party, knowing that the other party is acting on the basis of mistaken knowledge.  See Aniero Concrete Co., Inc. v. New York City Constr. Auth., Nos. 94 Civ. 9111, 95 Civ. 3516, 1997 WL 3268, at *13 (S.D.N.Y. Jan. 3, 1997), aff'd sub nom. Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566 (2d Cir. 2005).  None of these circumstances is present here.

The Court's earlier opinion dismissed Tuosto's fraudulent concealment claim with leave to replead.  Tuosto I, 2007 WL 2398507, at *8-9.  That opinion also held that Tuosto had not shown a special relationship for the purposes of a claim for negligent misrepresentation. See id. at *14-15.  In so holding, the Court found that Tuosto had not asserted any of the factors which can establish reasonable reliance on a party's representations in the absence of privity:

> whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it.

Id. at * 15 (quoting Kimmel v. Schafer, 89 N.Y.2d 257, 264, 675 N.E.2d 450, 454 (1996)).

Tuosto's Second Amended Complaint fails to bolster any of the necessary components of his allegation of fraudulent concealment. The Complaint does not specifically allege that PM USA owed the decedent a special duty and does not strengthen any inchoate suggestion that such a duty existed. Nor does the Complaint specify new statements that may have given rise to this duty. Based on Tuosto's failure to alter materially its earlier pleading, the claim for fraudulent concealment is dismissed.

## F.   Leave to Replead

Federal Rule of Civil Procedure 15(a)(2) instructs courts to freely allow amendments to pleadings "when justice so requires." When evaluating a claim under the heightened standard of Rule 9(b), a court may decline to offer an opportunity to amend, even if the plaintiff explicitly requests this opportunity, if the plaintiff has acted in bad faith or if an amendment would be futile. Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001) (McLaughlin, J.) (citing Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986)). Once one opportunity to amend has been granted, the court is not required to grant a

plaintiff a second opportunity to amend its complaint.   See
Aniero Concrete, Co., 1997 WL 3268, at *12 ("Dismissals
made pursuant to [Rule 9(b)], however, are almost always
accompanied by a grant of leave to amend, unless the
plaintiff has had a prior opportunity to amend its
complaint . . . .") (citations omitted).

    Although the Court now dismisses Tuosto's complaint
for fraud for the second time, Tuosto is granted leave to
replead this claim in keeping with the liberal precepts of
the Federal Rules.  However, the Court wishes to impress
upon Plaintiff that, should he choose to replead this cause
of action, he must plead sufficient facts to rectify the
many deficiencies identified by this decision and by the
Court's prior decision dismissing Tuosto's First Amended
Complaint.[7]

---

[7] Plaintiff is directed to the Court's opinion in Spier v. Erber
for guidance on this issue:

> [I]t has become an all too common practice for litigants
> granted leave to replead to make only minor changes in the
> original complaint  . . .  prompting a second motion to
> dismiss. An amended complaint which fails to replead with
> sufficient particularity after a finding of lack of
> specificity may well be regarded by the Court as a
> frivolous filing in violation of Fed. R. Civ. P. 11.

No. 89 CIV. 1657, 1990 WL 71502, at *10 n.8 (S.D.N.Y. May 24,
1990) (Leisure, J.).

III. Defective Design

In his second cause of action, Tuosto claims that PM USA is strictly liable for injuries caused to Rita Tuosto due to the defective design of its cigarettes. (See Second Am. Compl. ¶ 146)  To state a prima facie claim of products liability for a design defect under New York law, a plaintiff must allege that a manufacturer marketed a product that was "not reasonably safe" as designed, and that the defective design was a substantial factor in the plaintiff's injury.  Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107, 450 N.E.2d 204, 208 (1983); accord Baughn v. Pride Mobility Prods. Corp., 221 Fed. Appx. 14, 15 (2d Cir. 2007).  The plaintiff must further demonstrate that the product was "not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner."  Voss, 59 N.Y.2d at 108, 450 N.E.2d at 208; accord Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 80 (2d Cir. 2006).  Additionally, the plaintiff must show that it is possible to design "'the product so that it is safer but remains functional.'"  Adamo v. Brown & Williamson Tobacco Corp., 11 N.Y.3d 545, 550, 872 N.Y.S.2d 415, 417 (2008) (quoting Voss, 59 N.Y.2d at 109, 450 N.E.2d at 208-09).

31

While this motion to dismiss has been pending, the New York Court of Appeals has clarified the legal standard for a design defect claim as applicable to cigarettes.  Adamo, 11 N.Y.3d 545, 872 N.Y.S.2d 415 (2008).[8]  The plaintiff in Adamo, who died while waiting for her case to reach the Court of Appeals, had been a regular smoker since the 1950s.  Rose v. Brown & Williamson Tobacco Corp., 53 A.D.3d 80, 92, 855 N.Y.S.2d 119, 127 (N.Y. App. Div. 2008) (Catterson, J., dissenting).  The plaintiff smoked full-tar brands manufactured by R.J. Reynolds; The American Tobacco Company, now a part of Brown & Williamson; and PM USA. Id., 53 A.D.3d at 92, 855 N.Y.S.2d at 127-28 (Catterson, J., dissenting).  At trial on a claim for negligent product design,[9] the plaintiff offered evidence that light cigarettes, which contain "significantly lower levels of tar and nicotine" were a safer alternative design to full-

---

[8] The parties addressed the New York Court of Appeals ruling in Adamo by letters dated December 16, 2008, and December 31, 2008. The Court has docketed these letters.

[9] The design defect claim in Adamo was founded in negligence rather than strict liability.  Adamo, 11 N.Y.3d at 549, 872 N.Y.S.2d at 416.  However, "[a] product is defective for the purposes of a negligence or strict products liability claim if it is 'not reasonably safe.'"  Macaluso v. Herman Miller, Inc., No. 01 Civ. 11496, 2005 WL 563169, at *5 (S.D.N.Y. Mar. 10, 2005) (Koeltl, J.) (citing Denny v. Ford Motor Co., 87 N.Y.2d 248, 257, 662 N.E.2d 730, 735-36 (1995)).  Because Adamo addressed an element of establishing that cigarettes are "not reasonably safe," its holding is applicable to a claim for strict liability. Moreover, neither party, in their letters to the Court, has questioned Adamo's applicability to the instant action.

tar cigarettes, and thus that the latter design was
unreasonably dangerous. Adamo, 11 N.Y.3d at 550, 872
N.Y.S.2d at 418. The Court of Appeals reversed the jury
verdict in favor of the plaintiff, holding that it was not
sufficient merely to show that an alternative cigarette
design was safer—a plaintiff must also show that the
alternative design remained functional. Id., 11 N.Y.3d at
551, 872 N.Y.S.2d at 417-18. Specifically, "[t]he function
of a cigarette is to give pleasure to a smoker . . . .
Plaintiffs made no attempt to prove that smokers find light
cigarettes as satisfying as regular cigarettes . . . ."
Id., 11 N.Y.3d at 550, 872 N.Y.S.2d at 417. Thus to plead
adequately that a product whose only function is to please
a customer has a design defect, a plaintiff must allege
both that the product could be designed in a safer manner,
and that the safer alternate design is "as acceptable to
consumers." Id., 11 N.Y.3d at 551, 872 N.Y.S.2d at 417.

       Tuosto has not plausibly alleged that there is a safer
and functional alternate design to PM USA's cigarettes.
Tuosto alleges that PM USA's design process created a
cigarette that contained a "'[w]itches brew' of chemicals,"
allegedly including at least forty-three known carcinogens.
(Second Am. Compl. ¶¶ 150, 155 & 166.) PM USA allegedly
intended this engineering process to ensure that its

cigarettes would serve as an effective nicotine delivery
device.  (See id. ¶¶ 91, 148(q).)  Tuosto alleges that the
same engineering process that created PM USA's unreasonably
dangerous cigarettes could be employed to create a safer
alternative design:  namely, "cigarettes tailored to reduce
tar and maintain nicotine."  (Id. ¶ 168.)  Tuosto gives a
litany of technological processes PM USA allegedly declined
to use to make its cigarettes safer.  (See id. ¶¶ 168-86.)
Allegedly, PM USA possessed the means to produce a safer
cigarette that "still had the same nicotine 'kick' some
smokers desire."  (Id. ¶ 188.)  Indeed, Tuosto alleges that
PM USA did develop two safer cigarettes under the brand
names "Saratoga" and "Next."  (See id. ¶¶ 84, 188.)
"Saratoga" was allegedly a "'[p]hysiologically . . .
outstanding cigarette'" that would have "appealed to a
health conscious segment of the market."  (Id. ¶ 84.)
"Next" allegedly contained no nicotine and only trace
amounts of other dangerous chemicals.  (Id. ¶ 188.)

     However, Tuosto concedes that neither product as
marketed had an acceptable taste to smokers.  (See id. ¶¶
84, 187.)  Tuosto alleges that PM USA could have overcome
these deficiencies with sufficient advertising and
marketing, as well as by technologically improving the
cigarette's flavor. (See id. ¶¶ 187-88.)

Before evaluating if Tuosto has plausibly stated a claim for relief, the Court will first identify conclusory pleadings that it need not accept as true.  See Iqbal, 129 S. Ct. at 1950; Lloyds TSB, 639 F. Supp. 2d at 338-39. Tuosto makes only the barest and most conclusory statements alleging that PM USA could have improved the flavor of its otherwise safer cigarettes.  (See Second Am. Compl. ¶ 188-89.)  Without these allegations, Tuosto has failed to plead that Defendant's safer alternate designs remained functional—that is, equally acceptable to consumers as PM USA's other cigarettes.  See Adamo, 11 N.Y.3d at 551, 872 N.Y.S.2d at 417.  Because Tuosto has not plausibly pleaded that a safer, functional alternative design existed to PM USA's cigarettes, he has not stated a claim that those cigarettes were unreasonably dangerous.  See Voss, 59 N.Y.2d at 108, 450 N.E.2d at 208.

Tuosto's design defect complaint fails for an even more fundamental reason:  Tuosto does not state which of Defendant's cigarettes the decedent smoked.  Under New York law, the plaintiff bears the burden of showing that the defendant was the manufacturer of the product at issue. 210 E. 86th St. Corp. v. Combustion Eng'g, Inc., 821 F. Supp. 125, 142 (S.D.N.Y. 1993) (citing Hymowitz v. Eli Lilly & Co., 73 N.Y.2d 487, 504, 539 N.E.2d 1069, 1073 (1989)).

Tuosto has implicated a class of products, but no one product in particular.  Tuosto alleges that the decedent "always smoked Defendant's cigarettes."  (Id. ¶ 9.)  Later, Tuosto alleges that she chose "'Marlboro' as her cigarette" based on the advertising campaign containing the "Marlboro Man."  (Id. ¶ 128.)  Finally, Tuosto contends that the decedent "tried the 'law [sic] tar' cigarettes believing them to be more healthful."  (Id. ¶ 148(ll).)  Based on these allegations, this Court might infer that the decedent primarily smoked the Marlboro brand, but this allegation is by no means clear.

Without a specified product, the Court cannot evaluate, and the Defendant cannot respond, to Tuosto's claim.  Put simply, without a specified product, it is impossible to identify a specific defect.  The specific type of cigarette Rita Tuosto smoked becomes critically relevant in light of the New York Court of Appeals' Adamo decision.  Tuosto must show that any safer design would be equally satisfying to consumers as the allegedly unreasonably safe design.  Without a specified design, it is impossible to determine if a safer design would be "as acceptable to consumers."  Id., 11 N.Y.3d at 551, 872 N.Y.S.2d at 417.

For these reasons, the Court dismisses Tuosto's claim
for design defect without addressing the issue of
causation.  Because of the intervening clarification of New
York products liability law, and because of the liberal
precepts of Fed. R. Civ. P. 15(a)(2), the Court grants
Plaintiff leave to replead this claim.  See General Motors
Corp. v. United States, No. Civ.A. 01-CV-2201, 2005 WL
548266 (D.N.J. Mar. 2, 2005) (citing Sys. Fed'n No. 152,
Ry. Emp. Dept. AFL-CIO v. Pa. R.R. Co., 272 F. Supp. 971,
974 (S.D.N.Y. 1967)) (allowing plaintiff leave to amend its
complaint in light of an intervening Supreme Court
decision).[10]

---

[10] It is worth noting that a finding for Tuosto on a design defect
claim would effectively prohibit the sale of cigarettes in New
York State by judicial fiat.  Such a result would directly
contradict the judgment of the New York Court of Appeals in its
recent Adamo decision:

> To hold, as plaintiffs ask, that every sale of regular
> cigarettes exposes the manufacturer to tort liability
> would amount to a judicial ban on the product.  If
> regular cigarettes are to be banned, that should be
> done by legislative bodies, not by courts.

Adamo, 11 N.Y.3d at 551, 872 N.Y.S.2d at 418.  This result would
also contradict the congressional policy that has allowed the
sale and use of cigarettes in this country to continue.  See
F.D.A. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 137-39
(2000) (reviewing Congress' regulation of cigarettes which
"reveal[s] its intent that tobacco products remain on the
market"); Tuosto I, 2007 WL 2398507, at *12.

IV.   Negligence

In his third cause of action, Tuosto claims that PM
USA negligently manufactured,[11] sold and distributed its
cigarettes.  Under New York law, "[b]oth negligence and
strict products liability . . . require a showing of a
product 'defect.'"  Kosmynka, 462 F.3d at 86.  "A product
is defective for the purposes of a negligence or strict
products liability claim if it is 'not reasonably safe.'"
Macaluso v. Herman Miller, Inc., No. 01 Civ. 11496, 2005 WL
563169, at *5 (S.D.N.Y. Mar. 10, 2005) (Koeltl, J.) (citing
Denny v. Ford Motor Co., 87 N.Y.2d 248, 257, 662 N.E.2d
730, 735-36 (1995)).  Thus, just as in a products liability
claim, a plaintiff must show that "it was feasible to
design the product in a safer manner."  Adamo, 11 N.Y.3d at
550, 872 N.Y.S.2d at 417 (citations omitted).

Tuosto's allegations that PM USA negligently sold or
distributed its cigarettes fail to plausibly state a
legally cognizable claim.  The Court cannot summarize
Tuosto's related factual allegations:  there are none to be
found in his Complaint.  Tuosto's claim is bereft of
content and contains only legal conclusions unsupported by

---

[11] Tuosto makes no allegation that the cigarettes Rita Tuosto
smoked differed in any way from others manufactured by PM USA.
See Capara v. Chrysler Corp., 52 N.Y.2d 114, 123, 417 N.E.2d 545,
550 (1981) (stating that a plaintiff must show that a product had
not performed as intended).  Therefore, the Court reads this
claim as one of negligent product design.

factual allegations.  See Iqbal, 129 S. Ct at 1950;

Twombly, 550 U.S. at 555.  Furthermore, Tuosto has failed

to allege properly that it was feasible for PM USA to

design a safer, functional cigarette.  See supra Section

III.  Thus, Plaintiff's negligence claim is dismissed with

leave to replead.  See, e.g., Grace v. Rosenstock, 228 F.3d

40, 53-54 (2d. Cir. 2000) (Kearse, J.) (stating that a

district court may grant leave to replead at its

discretion).


V.   Loss of Consortium

     Plaintiff's action for loss of consortium is

derivative of his principal claims and "does not exist

'independent of the injured spouse's right to maintain an

action for injuries sustained.'" Jordan v. Lipsig,

Sullivan, Mollen & Liapakis, P.C., 689 F. Supp. 192, 196

(S.D.N.Y. 1988) (quoting Liff v. Schildkrout, 49 N.Y.2d

622, 632, 404 N.E.2d 1288, 1291 (1980)).  Because the Court

has dismissed all substantive claims for injuries allegedly

caused to Rita Tuosto, it must also dismiss this derivative

claim.  See Tuosto I, 2007 WL 2398507, at *15-16.  However,

because the Court has given Tuosto leave to replead his

independent claims, it also gives him leave to replead this

derivative action.

VI.   Wrongful Death

Plaintiff's final cause of action is a claim for wrongful death.  In New York, this action is defined by statute, which allows the decedent's personal representative to "recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued."  N.Y. Est. Powers & Trusts Law §§ 5-4.1. Thus to proceed in this action, Tuosto must first properly plead that the decedent could have brought an action against PM USA for injuries caused by a "wrongful act, neglect or default."  See Prink v. Rockefeller Center, Inc., 48 N.Y.2d 309, 315-16, 398 N.E.2d 517, 521 (1979). Because Tuosto has not adequately pleaded any "wrongful act, neglect or default" on the part of PM USA that the decedent could have acted on were she alive, her surviving spouse cannot proceed in this wrongful death claim.  See Emery v. Rochester Tel. Corp., 271 N.Y. 306, 309-10, 3 N.E.2d 434, 435-36 (1936) (holding that because injuries were not sustained as a result of the defendant's nonfeasance, the wrongful death action could not go forward); see also Tuosto I, 2007 WL 2398507, at *16.

40

Therefore, the Court dismisses this claim and, for the reasons stated above, grants Tuosto leave to replead.

### CONCLUSION

For the foregoing reasons, PM USA's Motion to Dismiss is GRANTED in full. The Court hereby DISMISSES all of Plaintiff's claims with leave to replead.  Plaintiff has thirty (30) days from the date of entry of this Opinion and Order to serve and file a Third Amended Complaint in accordance with the Court's analysis herein.

**SO ORDERED.**
**New York, New York**

November /9, 2009

_____
U.S.D.J.

Copies of this Opinion and Order have been sent to:

Joseph M. Lichtenstein, Esq.
LAW OFFICES OF JOSEPH M. LICHTENSTEIN, P.C.
170 Old Country Road
Suite 301
Mineola, New York 11501

Stephen R. Blacklocks, Esq.
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166

41